USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/6/05

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TEAMSTERS LOCAL 445 FREIGHT DIVISION :
PENSION FUND, on its own behalf and on behalf
of all those similarly situated,                    :

                 Plaintiff,    :

     - against -                                      :

BOMBARDIER INC., BOMBARDIER CAPITAL :
INC., BOMBARDIER CAPITAL MORTGAGE
SECURITIZATION CORPORATION,               :
LAURENT BEAUDOIN, BRIAN PETERS,
ROBERT GILLESPIE, and                           :
LAWRENCE F. ASSELL,

                            :

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION AND**
**ORDER**

05 Civ. 1898 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

         Teamsters Local 445 Freight Division Pension Fund ("Teamsters")

brings this action on behalf of open market purchasers of certain Certificates

offered by Bombardier Capital Mortgage Securitization Corporation ("BCM") and

Bombardier Capital Inc. ("BCI"). The Certificates were secured by pools of

manufactured housing installment sales contracts and mortgage loans. The

gravamen of plaintiff's allegations is that defendants engaged in a scheme to

1

defraud investors through misrepresentations and omissions regarding the integrity of BCI's underwriting standards for loan origination in order to amass large volumes of manufactured housing loans for immediate profit in the asset-backed securities market.[1] Plaintiff is alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 of the Securities and Exchange Commission.[2]

All defendants other than Gillespie[3] now move to dismiss the Complaint, arguing that it fails to state a cause of action for securities fraud, that Teamsters' claims are time-barred, and that Teamsters does not have standing to pursue the vast majority of the claims asserted.[4] For the following reasons, defendants' motion is denied as to BCI, BCM, Peters, and Assell, but granted as to BI and Beaudoin.

---

[1]     *See* First Amended Class Action Complaint ("Am. Compl.") ¶¶ 1-2.

[2]     15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10(b)(5).

[3]     Defendant Robert Gillespie, although named in the Complaint, has not appeared in this action.

[4]     *See generally* Memorandum of Law in Support of Defendants Bombardier Inc., Bombardier Capital Inc., Bombardier Capital Mortgage Securitization Corporation, Laurent Beaudoin, Brian Peters and Lawrence F. Assell's Motion to Dismiss the First Amended Complaint ("Def. Mem.").

## II.  THE COMPLAINT

The following allegations are drawn from the Complaint and presumed to be true for purposes of this motion.

### A.  The Parties

On May 10, 2002, Teamsters purchased $250,000 par value Series 2000-A Class A-2 Certificates for a total investment of $234,826.[5] On February 7, 2005, Teamsters filed a Complaint pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, defining a class of all purchasers of the Series 2000-A Certificates, who purchased their shares between January 7, 2000 and May 6, 2004.[6] On April 15, 2005, plaintiff amended the Complaint to expand the class to include purchasers of Series 1998-A, 1998-B, 1998-C, 1999-A, 1999-B and 2001-A Certificates, and enlarge the class period to include purchases between February 7, 2000 and February 7, 2005.[7]

Bombardier, Inc. ("BI") is a Canadian corporation operating multinational business divisions, principally engaged in the manufacture and sale

---

[5]  *See* Am. Compl. ¶ 25.

[6]  *See* Complaint ¶ 26.  The preamble to the original Complaint contains contradictory allegations that end the class period on May 6, 2003. *See id.* at 1.

[7]  *See* Am. Compl. ¶ 26.

of aircraft, recreational vehicles, railroad trains, and locomotive engines.[8] BCI, a wholly owned subsidiary of BI, is a financial services company principally engaged in the financing and leasing of BI's products, as well as the financing and leasing of manufactured housing (also known as "mobile homes") to consumers.[9] Plaintiff alleges that the "sole" purpose of BCM, a wholly owned limited purpose subsidiary of BCI, was to issue the Certificates.[10] BI, BCM, and BCI will hereafter be referred to collectively as "Bombardier."[11] Laurent Beaudoin was the President, Chief Executive Officer, and Chairman of the Board of Directors of BI.[12] Brian Peters and Lawrence F. Assell were directors and/or officers of BCI.[13]

### B. The Alleged Scheme

Plaintiff alleges that, beginning in 1997, Bombardier rushed to originate a massive number of mobile home loans and then, between January 1998

---

[8] *See id.* ¶¶ 26, 58.

[9] *See id.* ¶¶ 27, 58.

[10] *See id.* ¶¶ 28, 30.

[11] The Complaint defines BI, BCI, and BCM collectively as "Bombardier" and contains numerous allegations which do not differentiate between the three entities. *See id.* ¶ 1.

[12] *See id.* ¶ 31.

[13] *See id.* ¶¶ 32, 34.

and January 2001, packaged these loans for issuance in the asset-backed securities market through a number of separate certificate offerings.[14] Each series of Certificates had the same basic structure and was divided into classes which were assigned specific pools of mobile home collateral and came due on different dates.[15] Bombardier was drawn to this market by the "financial allure of 'gain on sale' accounting," which allowed it, "as the issuer of securitized assets, to book future expected profits on those securities as current income, boosting reported earnings."[16]

From 1998 to 2001, Bombardier issued false statements to investors regarding the "strict and prudent" underwriting standards used in the origination of the collateral supporting the Certificates.[17] The Certificate Offering Document or Prospectus for each series of Certificates contained an identical description of underwriting standards.[18] Each Prospectus stated that Bombardier's Credit Department would adhere, with limited deviation, to certain underwriting

---

[14]    *See id.* ¶¶ 4-7.

[15]    *See id.* ¶ 5 n.1.

[16]    *Id.* ¶ 59.

[17]    *Id.* ¶ 7.

[18]    *See id.*

guidelines, such as requiring each loan applicant to demonstrate stability of employment and residence, excluding applicants with debt-to-income ratios in excess of 45%, and applying the Fair Isaac Credit Organization ("FICO") credit scoring system.[19] Each Prospectus also disclosed the delinquency rates for the loans constituting the collateral for the Series 2000-A offering as 2% in 1998 and 8.14% in January 2000.[20] These "purported rigorous underwriting standards" and delinquency disclosures led, in material part, to the assignment of high ratings to the Certificates by various rating agencies.[21] Additionally, this description of Bombardier's underwriting guidelines, repeated in each Prospectus, was the only description of the origination of Certificate collateral upon which purchasers relied.[22]

Plaintiff alleges that, in fact, BCI's senior management disregarded underwriting standards in favor of volume loan purchases, infecting the pool of collateral with loans to "patently uncreditworthy" borrowers.[23] Defendants

---

[19]    *See id.* ¶ 7.

[20]    *See id.*

[21]    *Id.* ¶ 9.

[22]    *See id.* ¶ 8.

[23]    *Id.* ¶ 10.

recruited a senior management team, including Ronald Peace, Daniel J. Bialon, and Dan Stout, who directed employees to focus on loan volume and disregard underwriting standards.[24] Bombardier systematically purchased "large quantities of facially defective and deficient mobile home loans," including loans to applicants with no assets, no evidence of employment, debt exceeding income, and poor FICO scores.[25] Additionally, by linking low reports of delinquencies and repossessions to employee compensation, the management of BCI created incentives for underreporting.[26] At Stout's direction, repossessions were re-categorized as "re-financings" in order to avoid reporting.[27] Thus, Bombardier's reported delinquency figures were systematically understated.[28]

Bombardier's systematic practice of purchasing "bad paper" through

---

[24]    See id. ¶¶ 10, 67-73.

[25]    Id. ¶ 69. For example, Bombardier purchased pools of high risk "buy for" loans made to applicants who did not intend to live in the mobile homes or make the payments. See id. ¶¶ 77-78. Plaintiff alleges that "buy for" loans are high risk because the Fair Debt Collection Act prohibits discussion of the loans with any third party, thereby prohibiting contact with the occupant of manufactured housing without the borrower's consent. See id. ¶ 78 (citing 15 U.S.C. § 1692(c)).

[26]    See id. ¶¶ 10-12, 74-76.

[27]    See id. ¶¶ 12, 74-76.

[28]    See id. ¶ 75.

reckless underwriting led to a rapid increase in the percentage of delinquencies.[29]

In early 2000, Bombardier's management began to realize that reckless

underwriting practices had caused increasing rates of delinquencies and

foreclosures.[30] In response, Peace, Bialon, and Stout were replaced, and in April

2000, Bombardier disclosed certain understatements of delinquencies and claimed

that the problems had been corrected.[31]

However, Bombardier did not disclose its improper underwriting

practices between 2001 and 2003 in its Form 8-K filings or otherwise.[32] In the

Series 2001-A Prospectus supplement, BCI and BCM explained worsened

delinquency rates as arising from collection problems.[33] In September, 2001,

Bombardier left the manufactured housing asset-backed securities industry and, in

a press release, attributed the cause of its exit to market conditions.[34] In its March

19, 2002 Annual Report, BI explained portfolio downgrades by reference to the

---

[29] *See id.* ¶ 73.

[30] *See id.* ¶¶ 12-14.

[31] *See id.* ¶¶ 12-14, 97.

[32] *See id.* ¶¶ 18, 103, 120(h).

[33] *See id.* ¶ 100.

[34] *See id.* ¶¶ 16, 104.

"slowdown of the U.S. economy."[35]

On December 16, 2002, the Series 2000-A Certificates were downgraded below investment grade.[36] On December 27, 2002, Certificate prices declined by an average of 13.25%.[37] On February 25, 2003, the 1998-C and 1999-A Series Certificates were downgraded below investment grade. On March 5, 2003, the Certificates declined an average of 27%, resulting in an average price decline of 38% from December 24, 2002.[38]

## III.  LEGAL STANDARD

### A.  Standard of Review

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if "'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'"[39] The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the

---

[35]    *Id.* ¶¶ 103, 108, 109.

[36]    *See id.* ¶ 17.

[37]    *See id.*

[38]    *See id.*

[39]    *Weixel v. Board of Educ. of New York*, 287 F.3d 138, 145 (2d Cir. 2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

9

weight of the evidence which might be offered in support thereof."[40] When

deciding a motion to dismiss, courts must accept all factual allegations in the

complaint as true, and draw all reasonable inferences in plaintiffs' favor.[41] Courts

generally do not consider matters outside the pleadings but may consider

documents attached to the pleadings, documents referenced in the pleadings, or

documents that are integral to the pleadings.[42] Moreover, courts "may take judicial

notice of well-publicized stock prices without converting the motion to dismiss

into a motion for summary judgment."[43]

## B.    Section 10(b) and Rule 10b-5

### 1.    Standing

Only an actual purchaser or seller of a security has standing to sue

under section 10(b) of the Exchange Act and Rule 10b-5 promulgated

---

[40]    *Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 101 (2d Cir. 2003) (quotation marks and citations omitted).

[41]    *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[42]    *See id.* at 152-53; *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 331 (S.D.N.Y. 2003).

[43]    *Ganino v. Citizens' Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000) (citing cases). *Accord In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02 Civ. 5575, 2004 WL 992991, at *38 n.61 (S.D.N.Y. May 5, 2004).

thereunder.[44] The purpose of this rule, in a misrepresentation case, is to "limit[]

the class of plaintiffs to those who have at least dealt in the security to which the

prospectus, representation, or omission relates."[45] A putative class representative

lacks standing to bring a claim if it did not suffer the injury that gives rise to that

claim.[46]

> In order to maintain a class action, Plaintiffs must first establish
> that they have a valid claim with respect to the shares that they
> purchased. If the *named* plaintiffs have no cause of action in their
> own right, their complaint must be dismissed, even though the
> facts set forth in the complaint may show that others might have
> a valid claim.[47]

---

[44] *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 723
(1975); *Grace v. Rosenstock*, 228 F.3d 40, 46 (2d Cir. 2000) ("Early in the
development of such actions under § 10(b) and Rule 10b-5, which addresses fraud
'in connection with' the purchase or sale of a security, this Court ruled that no
private action under those provisions is available to persons who were neither
buyers nor sellers of the relevant securities.").

[45] *Blue Chip Stamps*, 421 U.S. at 747.

[46] *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (plaintiffs with one
type of injury lack standing to challenge a different, though perhaps related,
injury, because "standing is not dispensed in gross"); *Griffin v. Dugger,* 823 F.2d
1476, 1483 (11th Cir. 1987) ("a claim cannot be asserted on behalf of a class
unless at least one named plaintiff has suffered the injury that gives rise to that
claim.").

[47] *In re Initial Public Offering Sec. Litig.,* 341 F. Supp. 2d 328, 343-44
(S.D.N.Y. 2004) (quotation marks and citations omitted). *See also Ramos v.
Patrician Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) ("A plaintiff,
including one who is seeking to act as class representative, must have individual
standing to assert the claims in the complaint against each defendant being sued by

Where plaintiffs bring multiple claims, at "least one *named* plaintiff must have standing to pursue each claim alleged."[48]

A named plaintiff in a class action that purchased securities from one issuer does not have standing to bring claims on behalf of purchasers of securities from a *different issuer*.[49] Additionally, courts have held that a class action plaintiff does not have standing to bring claims on behalf of purchasers of different securities where those claims are based on different factual allegations and legal theories.[50]

## 2. Statute of Limitations and Statute of Repose

Section 804(a) of the Sarbanes-Oxley Act of 2002 states that:

a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section

---

him."); *Akerman v. Oryx Communications, Inc.*, 609 F. Supp. 363, 377 (S.D.N.Y. 1984) ("'A predicate to a plaintiff's right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, he may not accomplish as a representative of a class.'") (quoting *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (3rd Cir. 1970)).

[48]     *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004). *Accord In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003).

[49]     *See In re Initial Public Offering Sec. Litig.*, 341 F. Supp. 2d at 346.

[50]     *See In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d at 496.

3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47), may be brought not later than the earlier of

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.[51]

"Discovery of facts for the purposes of this statute of limitations 'includes constructive or inquiry notice, as well as actual notice.'"[52]

> A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. . . . Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry.[53]

To be placed on inquiry notice, plaintiffs "need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them."[54] "The issue that

---

[51]     28 U.S.C.§ 1658(b).

[52]     *Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir. 2000) (quoting *Menowitz v. Brown*, 991 F.2d 36, 41-42 (2d Cir. 1993)).

[53]     *Dodds v. Cigna Sec. Litig.*, 12 F.3d 346, 350 (2d Cir. 1993) (citations omitted).

[54]     *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997).

the Court must consider is . . . whether Plaintiffs 'had constructive notice of facts sufficient to create a duty to inquire further into that matter. An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.'"[55]

However, available information must establish "a probability, not a possibility" of fraud to trigger inquiry notice.[56] Moreover, on a motion to dismiss, "[u]nless Defendants can produce 'uncontroverted evidence [that] irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme,' they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law."[57] The Court of Appeals has been "decidedly reluctant to foreclose [] claims as untimely absent a manifest indication that plaintiffs could have learned the facts underpinning their allegations" prior to the statutory limitations period.[58]

---

[55]   *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (quoting *Dodds*, 12 F.3d at 351-52).

[56]   *Id.* at 194.

[57]   *In re Initial Public Offering Sec. Litig.*, 341 F. Supp. 2d at 347 (quoting *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).

[58]   *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 169 (2d Cir. 2005) (emphasis omitted).

Facts triggering a duty to inquire are frequently termed "storm warnings."[59] Once sufficient storm warnings appear, "plaintiffs must exhibit 'reasonable diligence' in investigating the possibility that they have been defrauded. If they fail to meet this obligation, plaintiffs will be held to have had 'constructive knowledge' of the fraud against them."[60]

Section 804(a)(2) of the Sarbanes-Oxley Act is a statute of repose which requires that a plaintiff bring a section 10(b) or Rule 10b-5 claim within five years of the violation of the securities laws, regardless of when the plaintiff discovered the violation.[61] The period of repose begins when the last alleged misrepresentation was made.[62]

### 3. Prima Facie Case

---

[59]   *Dodds,* 12 F.3d at 350 (citations omitted).

[60]   *Addeo v. Braver*, 956 F. Supp. 443, 449 (S.D.N.Y. 1997) (quoting *Dodds*, 12 F.3d at 350) (citations omitted).

[61]   28 U.S.C.§ 1658(b).

[62]   *See Quaak v. Dexia S.A.,* 357 F. Supp. 2d 330, 338 (D. Mass. 2005) ("Under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation"); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 778 F. Supp. 695, 699 (S.D.N.Y. 1991) (under prior statutory three-year period of repose, plaintiff required to commence action under section 10(b) within three years of the "most recent violation of Section 10(b) of which plaintiff complains"); *Continental Bank, Nat'l Ass'n v. Village of Ludlow*, 777 F. Supp. 92, 102 (D. Mass. 1991) (period of repose "begins when the last alleged misrepresentation was made" by the defendants).

To state a prima facie case for securities fraud under section 10(b) of the Exchange Act[63] and Rule 10b-5 promulgated thereunder, a plaintiff must allege that "'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff.'"[64] The requisite scienter, or state of mind, in an action under section 10(b) and Rule 10b-5 is "'an intent to deceive, manipulate or defraud.'"[65]

Securities fraud actions are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[66] In addition, a plaintiff alleging securities fraud under section 10(b) and Rule 10b-5 must satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of

---

[63]    15 U.S.C. § 78j.

[64]    *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino*, 228 F.3d at 161 (citing cases)).

[65]    *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[66]    Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally." *See also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001) (applying Rule 9(b) standard to securities fraud claims).

1995 ("PSLRA").[67] To plead a material misrepresentation or omission under the PSLRA "the complaint [must] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."[68] Similarly, "[t]o meet the pleading standard of Rule 9(b), this Court has repeatedly required, among other things, that the pleading 'explain why the statements were fraudulent.'"[69]

### a.    Transaction and Loss Causation

To maintain a claim for securities fraud, a plaintiff must plead, among other things, both (i) that it relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities, and (ii) that defendant's conduct caused

---

[67]    Pub. L. No. 104-67, 109 Stat. 737 (1995). *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

[68]    15 U.S.C. § 78u-4(b)(1).

[69]    *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). *See also id.* ("The PSLRA imposes similar requirements to claims brought under the Exchange Act: 'the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'") (citing 15 U.S.C. § 78u-4(b)(1)).

17

plaintiff's loss at least in part.[70] These two elements are known, respectively, as "transaction causation" and "loss causation."

"Transaction causation is generally understood as reliance."[71] A rebuttable presumption of transaction causation may be established under the "fraud on the market" theory, even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale.

> Succinctly put: "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."[72]

Pleading that defendants perpetrated a fraud on the market, therefore, fulfills a plaintiff's transaction causation pleading requirement. Reliance may also be presumed in cases based on omissions if plaintiff can show that such omissions

---

[70]     See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001).

[71]     Id. at 186.

[72]     Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (alterations in original) (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).

were material.[73]

A defendant may rebut the fraud on the market presumption by showing that it made no material misrepresentations because the alleged misrepresentations were already known to the market — a so-called "truth on the market" defense.[74] "However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."[75] As the Court of Appeals has noted, "[t]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."[76]

Loss causation, on the other hand, refers to the requirement that a plaintiff demonstrate that the fraudulent scheme caused her loss.[77] In the case of

---

[73]  *See Castellano*, 257 F.3d at 186; *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 539 (2d Cir. 1999). *See also In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 291 (S.D.N.Y. 2003) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972)).

[74]  *See Ganino*, 228 F.3d at 167.

[75]  *Id.* (quotation marks and citations omitted).

[76]  *Id.*

[77]  *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716-17 (2d Cir. 1980) (Meskill, J., dissenting) (noting that "a fundamental principle of causation which has long prevailed under the common law of fraud and which has been

10b-5 actions for material misstatements or omissions, loss causation generally requires a plaintiff to show that her investments would not have lost value if the facts that defendants misrepresented or omitted had been known.[78]

A plaintiff cannot satisfactorily allege loss causation simply by alleging that she purchased securities at artificially inflated prices. In *Dura Pharmaceuticals, Inc. v. Broudo*,[79] the Supreme Court rejected the Ninth Circuit's permissive pleading standard for loss causation, which required only that a plaintiff allege that she had bought a security at an artificially inflated price.[80] The Court noted that:

> [I]t should not prove burdensome for a plaintiff who has suffered

---

applied to comparable claims brought under the federal securities acts . . . is, quite simply, that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause."). In 1995, Congress codified the loss causation requirement in the PSLRA:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

[78]     *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001).

[79]     125 S.Ct. 1627, 1630 (2005).

[80]     *See Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938 (9th Cir. 2003).

an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid.[81]

Most recently, the Second Circuit has held that a plaintiff must allege that "the loss be foreseeable and [ ] the loss be caused by the materialization of the concealed risk."[82] This Court's recent decision in *In re Initial Public Offering Securities Litigation* describes in detail the Second Circuit's loss causation standard:

Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed — i.e. a corrective disclosure.[83]

### b. Scienter

Under the PSLRA, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required

---

[81]    *Dura*, 125 S.Ct. at 1634.

[82]    *Lentell*, 396 F.3d at 173 (emphasis omitted).

[83]    No. 21 MC 92, 2005 WL 1529659, at *6 (S.D.N.Y. June 28, 2005) (citations omitted).

state of mind."[84]  The Court of Appeals has explained that facts giving rise to a

strong inference of scienter can be alleged in either of two ways:  plaintiff may

plead "motive and opportunity to commit fraud" or "strong circumstantial

evidence of conscious misbehavior or recklessness."[85]

> In general, a strong inference of scienter
>
> may arise where the complaint sufficiently alleges that the defendants:  (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.[86]

To allege recklessness sufficiently, the facts must "approximate an actual intent to

aid in the fraud being perpetrated."[87]  Plaintiff must allege facts showing that the

defendants' conduct was "highly unreasonable, representing an extreme departure

from the standards of ordinary care to the extent that the danger was either known

to the defendant or so obvious that the defendant must have been aware of it."[88]

---

[84]    15 U.S.C. §78u-4(b)(2).

[85]    *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

[86]    *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir. 2000) (citations omitted).

[87]    *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996) (quotation marks and citation omitted).

[88]    *Rothman,* 220 F.3d at 90 (citation omitted).

"Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'"[89]

### C.   Section 20(a)

Section 20(a) states, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly induce the act or acts constituting the violation or cause of action.[90]

"The elements of a claim under Section 20(a) include both a primary violation and control over the primary violator."[91] "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the

---

[89]    *Ganino*, 228 F.3d at 169 (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)).

[90]    15 U.S.C. §§ 78t(a).

[91]    *In re Parmalat Securities Litigation*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005). *Accord In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 392.

ownership of voting securities, by contract, or otherwise.'"[92] "A plaintiff is required to prove actual control, not merely control person status. Naked allegations of control, however, will typically suffice to put a defendant on notice of the claims against her."[93] Status of defendants as directors, "standing alone, is insufficient to establish their control."[94]

A claim under section 20(a) must be pleaded in accordance with Rule 8(a) of the Federal Rules of Civil Procedure.[95] Rule 8(a) requires that the plaintiff

---

[92]    *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2 and adopting this standard for a section 20(a) claim).

[93]    *In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d at 352 (citations omitted).

[94]    *In re Philip Services Corp. Sec. Litig.,* No. 98 Civ. 0835, 2004 WL 1152501, at *19 (S.D.N.Y. May 24, 2004) (citations omitted). *Accord Food & Allied Service Trades Dep't, AFL-CIO v. Millfield Trading Co.,* 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) ("While courts in this circuit have not always agreed on just how much beyond status as a director must be alleged to plead a Section 20(a) claim . . . they have agreed that a bare allegation of director status, without more, is insufficient.").

[95]    *See In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d at 396. "Neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a Section 20(a) claim." *Id.* at 396-97 (citations omitted).

The Second Circuit has not directly addressed the issue of whether a claim under section 20(a) must meet heightened pleading requirements. Decisions in this district are split on this issue, although the majority of recent decisions hold that claims under Section 20(a) are subject only to the pleading standards of Rule

must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."[96] Rule 8(a) does not require "a plaintiff to plead the legal theory, facts, or elements underlying his claim."[97] "To comply with Rule 8, plaintiffs need not provide anything more than sufficient notice to permit defendant to file an answer."[98]

## IV. DISCUSSION

### A. Plaintiff Has Standing to Assert Claims for All the Certificate Offerings

Very few courts have addressed the issue of whether a class representative who purchased certain classes of securities has standing to pursue claims on behalf of purchasers of other classes of securities from the *same issuer*.

---

8(a). *See Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,* No. 03 Civ. 3120, 2005 WL 1902780, *16 (S.D.N.Y. Aug. 9, 2005); *In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 472, 517 (S.D.N.Y. 2005); *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288, 2004 WL 1097786, at *2 (S.D.N.Y. May 18, 2004); *In re Vivendi Universal, S.A.,* No. 02 Civ. 5571, 2003 WL 22489764, at *24 (S.D.N.Y. Nov. 3, 2003). *But see In re Bayer AG Sec. Litig.,* No. 03 Civ. 1546, 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004) (applying the requirements of the PSLRA to a section 20(a) claim); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004) (same).

[96] Fed. R. Civ. P. 8(a).

[97] *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir. 2005) (citations omitted).

[98] *In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d at 323 (citations omitted).

One court framed the inquiry as whether the named plaintiff's "injury [wa]s substantively different from the injury suffered by holders of other classes" of those securities.[99] In *In re Salomon Analyst Level 3 Litigation*, the court held that equity security holders lacked standing to bring claims on behalf of bondholders, because the bondholders alleged substantively different injuries than the equity security holders.[100] However, the court also held that a bondholder did have standing to bring claims on behalf of other classes of bondholders, because the injuries alleged were substantively similar.[101]

Defendants argue that this case is distinguishable from *Salomon* because corporate debt securities all "rise or fall based on the overall health of the issuer," while in the instant case "each series of Certificates is collateralized by entirely different pools of manufactured housing sales contracts and mortgage loans."[102] Defendants' argument is unavailing. Plaintiff alleges that the value of

---

[99]  *See In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d at 497.

[100]  *See id.*

[101]  *See id.  But see Vervaecke v. Chiles, Heider & Co., Inc.*, 578 F.2d 719 (8th Cir. 1978) (holding that plaintiff that had purchased a 1973 bond offering did not have standing to sue as class representative on behalf of plaintiffs that had purchased 1976 issue bonds, even though there were "several similarities between the two bond offerings and the nature of the alleged fraud.").

[102]  Defendants' Reply Memorandum of Law in Further Support of Defendants Bombardier Inc., Bombardier Capital, Inc., Bombardier Capital Mortgage Securitization Corporation, Laurent Beaudoin, Brian Peters and

each class of Certificates rose and fell based on the *policies* of the same issuer (BCI) in underwriting the loans that were the collateral for each class of Certificates.[103] In this action, the alleged misrepresentations relating to the underwriting practices of BCI were repeated verbatim in the Prospectus for each series of Certificates.[104] Thus, plaintiff has standing to represent a class of all purchasers who relied on the same repeated, material misstatements and thus suffered the same injury when the value of their securities declined.

**B.      Teamsters' Claims Are Not Time Barred**

      **1.      Teamsters' Claims Are Not Barred by the Statute of Limitations**

            **a.      Inquiry Notice**

Defendants argue that Teamsters was placed on inquiry notice of its claim more than two years prior to February 7, 2005, when Teamsters filed its original Complaint.[105] Defendants point to a number of potential storm warnings, including: i) a decline in Certificate prices, ii) rating agency and analyst reports,

---

Lawrence F. Assell's Motion to Dismiss the First Amended Complaint, at 8.

[103]    *See* Am. Compl. ¶¶ 81-90.  The plaintiff also alleges that the relevant securities materially declined in price on the same days.  *See id.* ¶¶ 17, 122, 115.

[104]    *See id.* ¶¶ 81-90.

[105]    *See* Def. Mem. at 15.

and iii) disclosures by Bombardier.[106] Drawing all reasonable factual inferences in

plaintiff's favor, as I must, these storm warnings are insufficient to warrant

dismissal based on inquiry notice of the alleged fraud.

### i.    Certificate Price Decline

Defendants allege that a 13.25% decline in the price of the

Certificates on December 26, 2002 should have put the plaintiff on inquiry notice

of fraudulent activity.[107] Defendants are wrong. While the price decline may have

put Teamsters on notice that the Certificates were performing poorly, it did not

indicate the type of fraudulent activity alleged in the Complaint.[108] The gravamen

of this Complaint is that Bombardier falsely represented that it adhered to strict

underwriting standards in loan origination. As this Court explained in *In re Initial*

*Public Offering Securities Litigation*, "price fluctuations are a factor that may be

considered," but are not sufficient by themselves to put plaintiffs on inquiry

notice.[109] Moreover, when courts have found that price declines triggered inquiry

---

[106]    *See id.* at 19-23.

[107]    *See id.* at 17-18.

[108]    *See, e.g.,* allegations that Bombardier systematically underreported
delinquencies in the collateral pool and misattributed poor performance to market
conditions. *See* Am. Compl. ¶¶ 14-15, 29, 75, 97, 100.

[109]    *In re Initial Public Offering Sec. Litig.*, 341 F. Supp. 2d at 350.
*Accord La Grasta v. First Union Secs., Inc.,* 358 F.3d 840, 848 (11th Cir. 2004) (a

notice, the drop in the value of the security at issue was far more dramatic than the drop that occurred here, and there were additional storm warnings present.[110]

### ii.  Rating Agency and Analyst Reports

Defendants also rely on various rating agency and analyst reports to support their claim that Teamsters was placed on inquiry notice before February 7, 2003. It is well established that a plaintiff is charged with knowledge of publicly available rating agency and analyst reports.[111]

A close reading of the reports cited by defendants in support of their claim of inquiry notice reveals that few of the facts necessary to establish plaintiff's core claims are found in those reports. A reasonable investor, upon reading these reports, would surely have concluded that the Certificates and

---

dramatic drop in stock prices did not trigger the statutory limitations period until an article in the financial press was published detailing the very allegations made by the complaint).

[110]  *See, e.g., In re Global Crossing, Ltd. Sec. Litig.,* 313 F. Supp. 2d at 200 (50% price decline and *Fortune* magazine article describing the fraud); *de La Fuente v. DCI Telecomm., Inc.,* 206 F.R.D. 369, 382 (S.D.N.Y. 2002) (76% price decline, revisions of financial statements, and disclosure of SEC investigation).

[111]  *See In re Initial Public Offering Sec. Litig.,* 341 F. Supp. 2d at 347-48 (plaintiff is properly charged with knowledge of "readily accessible publications"); *Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.,* 821 F. Supp. 212, 222 (S.D.N.Y. 1993) (plaintiff "is charged with knowledge of publicly available news articles and analysts' reports").

collateral were performing poorly, but poor performance alone is not an indication of securities fraud.[112] In fact, many of the proffered reports suggest benign explanations for the poor performance of the Certificates which would not raise the suspicions of the reasonable investor.[113]

Similarly, the reports did not place plaintiff on inquiry notice because they did not sufficiently describe the actual scheme that is the basis for the plaintiff's claims for relief.[114] Only three of the proffered reports suggest that the

---

[112] *See In re Initial Public Offering Sec. Litig.*, 341 F. Supp. 2d at 350 (a company's failure to meet revenue forecasts only proves "that the revenue forecasts were *wrong*, not that they were *fraudulent*") (emphasis added). *Cf. In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d at 200 (article giving rise to inquiry notice "did not merely indicate general financial difficulties . . . rather it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud.").

[113] For example, a May 30, 2002 Standard & Poor's report mentions "extremely fierce" competition. *See* Declaration of A. Robert Pietrzack in Support of Defendants' Motion to Dismiss the First Amended Complaint ("Pietrzack Decl."), Ex. 5 at 2. A May 2, 2002 Fitch report mentions oversupply of inventory, heavy competition, and servicing and collection problems. *See id.* Ex. 6 at 1-2.

[114] *See Lentell*, 396 F.3d at 169. *See also In re Initial Public Offering Sec. Litig.*, 341 F. Supp. 2d at 348 (plaintiffs were not put on inquiry notice by articles which said "nothing about the *actual scheme* alleged to have damaged Plaintiffs in the instant case"); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 299 (S.D.N.Y. 2004) (media reports that did not "disclose the systematic misrepresentations charged in this suit" were not storm warnings).

cause for the poor performance of the Certificates was related to underwriting.[115]

These reports put investors on notice that Bombardier's "aggressive underwriting

practices"[116] and "combination of underwriting and servicing problems"[117] had led

to the weak performance of the collateral pool. Aggressive underwriting,

however, does not amount to "routine disregard [for] all underwriting guidelines . .

. at the direction of senior management."[118] Notification of a problem is not

necessarily notification of fraud.[119] These reports "do not suggest the widespread

---

[115]    Cf. In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 388-89 (S.D.N.Y. 2003) (district court took judicial notice of "abundant material" in the public domain to conclude that the "whole investment community" was on inquiry notice of conflicts of interests in investment banking).

[116]    The May 2, 2002 Fitch Report stated that, "A combination of underwriting and servicing problems had produced the highest levels of delinquencies and repossessions observed by Fitch." See Pietrzack Decl., Ex. 6 at 3.

[117]    An August 17, 2000 Moody's Investors Service report states that "the primary driver of the weak pool performance is the aggressive underwriting practices that [Bombardier] pursued in 1997 and 1998, given the competitive environment." See id. Ex. 3 at 1.

[118]    Am. Compl. ¶ 90. See In re Worldcom, 02 Civ. 3288, 2003 WL 22790942, at *5 (S.D.N.Y. Nov. 25, 2003) (articles discussing "friendships," unusual meetings, difficulty of policing analyst in question, and conflicts of interest were not sufficiently specific to put plaintiff on notice of claim that analyst issued false research reports in exchange for investment banking business).

[119]    See In re Alcatel Sec. Litig., No. 02 Civ. 3818, 2005 WL 475896, at *8 (S.D.N.Y. Feb. 28, 2005) (news articles and events "indicative of a potential inventory problem were not sufficient storm warnings to indicate to Plaintiffs the

fraud alleged here — they only provide the background."[120]

Only one of the reports mentions any facts that would suggest that

Bombardier had fraudulently deviated from its stated underwriting guidelines.[121]

The report, a Standard & Poor's publication dated May 30, 2002, covered the

entire manufactured housing asset-backed securities market. The report stated:

> In the mid-1990s there was a general trend toward higher-than-expected incidence of unauthorized exceptions to underwriting guidelines. This resulted from the effort to increase volumes in a highly competitive environment. Examples of higher losses due to looser underwriting include pools from Associates, INDYMAC, GreenPoint, UCFC, and Bombardier.[122]

---

probability of a fraudulent failure to write down inventory in a timely fashion").

[120]    *Fogarazzo*, 341 F. Supp. 2d at 300. *Accord In re Salomon Analyst Winstar Litig.*, 373 F. Supp. 2d 241, 246 (S.D.N.Y. 2005) (plaintiffs were on inquiry notice when, among other storm warnings, analyst "issued a daming report on Winstar, identifying each of the problems that plaintiffs claim were fraudulently omitted or misrepresented"); *Merrill Lynch,* 273 F. Supp. 2d at 388 (media reports specifically identified the defendant as suffering from wide-spread conflicts of interest and detailed particular statements by Merrill Lynch analysts indicating a massive scheme to defraud).

[121]    In *In re Global Crossing, Ltd. Sec. Litig.,* the district court held that "[a] single published article can be sufficient to provide inquiry notice." 313 F. Supp. 2d at 200. However, the article in that case, published in *Fortune* magazine, described in detail the precise "transactions at the heart of plaintiffs' allegations" of fraud. *Id.*

[122]    Pietrzak Decl., Ex. 5 at 33. The report stated that "typically", Standard & Poor's reviewed an issuer's underwriting process on-site. *Id.* The report also stated that low quality underwriting *"could* include failure to check credit reports carefully or failure to verify income and employment." *Id.* But the

The report does not suggest a scheme to amass loan volume through flagrant disregard for underwriting standards; rather, it points to a "higher-than-expected" number of deviations from guidelines. Such a snippet, while it may raise suspicions, is insufficient to alert plaintiff to the general fraudulent scheme alleged in the Complaint.[123]

The reports do not indicate that Bombardier had engaged in "the practice of buying large quantities of facially defective and deficient mobile home loans," including loans to applicants with no assets, no evidence of employment, debt exceeding income, and poor FICO scores.[124] Nor do the reports alert the reasonable investor to the fact that Bombardier had systematically and deliberately underreported delinquencies and repossessions.[125] As in *Lentell v. Merrill Lynch & Co., Inc.*, "evidence of the outright falsity" of the alleged misrepresentation "is stray and indiscriminate at best, and is insufficient to put plaintiffs on notice of the

---

report did not state that Bombardier engaged in these practices or that Standard & Poor's had specifically reviewed Bombardier's underwriting process.

[123]   *See Worldcom,* 2003 WL 22790942, *4 (press reports alone did not sufficiently reveal the details of allegations so as to put plaintiffs on inquiry notice).

[124]   Am. Compl. ¶ 69.

[125]   *See id.* ¶¶ 10-12.

specific frauds alleged."[126]

### iii.   Disclosures

Defendants claim that the 2001-A Prospectus Supplement, dated January 25, 2001, gave plaintiff notice of its claims because it disclosed that delinquencies in BCI's asset pools had "exceeded reported industry levels over corresponding periods, in certain cases by a significant degree."[127] However, the fact that the asset pool was suffering from high levels of delinquency does not equate to the probability of fraud.[128]

A further problem is that the Prospectus Supplement suggested other causes for the high delinquency rates.  For example, the Prospectus Supplement

---

[126]   *Lentell*, 396 F.3d at 171.  Even if read together, these reports amount to only a "possibility" of fraud, and do not rise to the level of "probability" sufficient to put an investor on inquiry notice.  *See Newman,* 335 F.3d at 193 (citation omitted).

[127]   Def. Mem. at 163 (quoting Pietrzak Decl., Ex. 2 at S-41).

[128]   Defendants also argue that plaintiff was on inquiry notice as of September 26, 2001, when Bombardier announced that it planned to leave the manufactured housing industry and take special charges of $662.5 million on account of loans written off by BCI for both manufactured-housing and consumer finance.  This announcement may have put investors on notice of BCI's failures, but it did not alert a reasonable investor to fraud.  *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) ("[m]any companies take one-time charges to reflect unanticipated developments without creating any suspicion of impropriety").

34

states that BCI had been implementing initiatives to resolve the problem, including replacement of the management of BCI's Mortgage Division, the reorganization of servicing centers, and "the introduction of more conservative underwriting guidelines in an effort to improve the credit quality of the obligors."[129] The suggestion that the problems could be addressed through reorganization of BCI's loan servicing operations could lead a reasonable investor to conclude that the problem was related to collection, rather than faulty origination or deliberate underreporting of delinquencies.[130] And an investor might also reasonably consider problems such as impediments to collection to be curable. However, the problem alleged by plaintiff — patently uncreditworthly loans endemic to the collateral pool — is incurable. Because the Prospectus Supplement offered a benign explanation, it did not put Teamsters on notice of fraud.[131]

---

[129]     Pietrzak Decl., Ex. 2 at S-41.

[130]     *See* Am. Compl. ¶¶ 100-101

[131]     *See Newman,* 335 F.3d at 194 (plaintiffs did not have inquiry notice where defendants disclosed certain write-downs on a Form 10-K, but explained that the write-downs resulted from changed accounting methods). *Accord LC Capital Partners, LP,* 318 F.3d at 155 ("There are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management."). *Cf. Jackson National Life Ins. Co.*

In sum, the storm warnings cited by defendants do not establish, as a matter of law, that Teamsters had inquiry notice of the claims prior to February 7, 2003.

> **b.** **Claims Based on Purchases of the 1998-A, 1998-B, 1998-C, 1990-A, 1999-B, and 2001-A Series Certificates**

Defendants claim that plaintiff concedes that it was on inquiry notice of its claim as of March 5, 2003.[132] Teamsters filed its Amended Complaint on April 15, 2005, in which it asserted, for the first time, claims based on purchases of the 1998-A, 1998-B, 1998-C, 1990A, 1999-B, and 2001-A Certificates. Defendants move to dismiss these claims as time barred because they were filed approximately one month after the expiration of the limitations period.[133]

Rule 15(c) provides for the relation back of an amendment of a pleading to the date of the original proceeding, for purposes of the statute of limitations, provided that the claim asserted in the amended complaint "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in

---

v. *Merrill Lynch & Co. Inc.*, 32 F.3d 697, 702 (2d Cir. 1994) (inquiry notice existed when absence of a certain provision from prospectus was "virtually conclusive evidence" of facts demonstrating the purported fraud).

[132] *See* Def. Mem. at 25.

[133] *See id.* at 25.

the original pleading."[134] Rule 15(c) applies to the addition of new plaintiffs "if defendants could reasonably have expected them to be added."[135]

The Amended Complaint relates back to the original Complaint because it alleges new claims based on the same conduct alleged in the original Complaint — a fraudulent scheme to misrepresent the quality of underwriting, which was factually the same for each class of Certificate purchasers.[136] Although the Amended Complaint expands the number of offerings sued upon from the original Complaint, defendants had adequate notice of these claims, because the scheme of fraudulent underwriting alleged in the original Complaint applied equally to other Certificate collateral originated by BCI.[137]

Furthermore, although the Complaint concedes that sufficient storm

---

[134]    Fed. R. Civ. P. 15(c)(2).

[135]    *Staggers v. Otto Gerdau Co.*, 359 F.2d 292, 297 (2d Cir. 1966). *Accord Lucchesi v. Experian Information Solutions, Inc.*, 26 F.R.D. 172, 175 (S.D.N.Y. 2005); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F. Supp. 620, 642 (S.D.N.Y. 1993).

[136]    *See Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 397 (E.D.N.Y. 1998) (new claims were a "'natural offshoot' of the 'basic scheme'") (citation omitted).

[137]    *See* Am. Compl. ¶¶ 82-90. "As long as the original complaint gives the defendant adequate notice, an amendment relating back is proper even if it exposes defendants to greater damages." *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F. Supp. at 644 (citing 3 Moore's Federal Practice ¶ 1501 at 162 (1992)).

warnings appeared on March 5, 2003, it does not concede that the statute of limitations began to run on that date.[138] Once storm warnings appear, plaintiffs are not held to have constructive knowledge of a fraud unless they fail to "exhibit 'reasonable diligence' in investigating the possibility that they have been defrauded."[139] Thus, even if Teamsters was on inquiry notice as of March 5, 2003, knowledge of the fraud is not imputed unless Teamsters did not exercise reasonable diligence.[140] Interpreted in the light most favorable to the plaintiff, Teamsters has sufficiently pleaded that it exercised reasonable diligence in its attempt to uncover the fraud.[141] Therefore, even if the claims of the Amended

---

[138] Plaintiff alleges that "Significant Certificate trading price declines, which would have reasonably triggered investor inquiry only had occurred as of March 5, 2003." Am. Compl. ¶ 121(e).

[139] *Addeo*, 956 F. Supp. at 449 (quoting *Dodds*, 12 F.3d at 350) (citations omitted).

[140] *See LC Capital Partners, LP*, 318 F.3d at 154 ("if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor in the exercise of reasonable diligence should have discovered [concerning the wrongdoing]").

[141] The Complaint alleges that even though inquiry was "triggered in March 2003," plaintiff could not have uncovered the facts alleged in the Complaint "absent extraordinary and time consuming investigatory efforts" because "Bombardier [had] closed its mobile home loan underwriting business in 2001 and terminated substantial employees with knowledge of the improper practices." Am. Compl. ¶ 121(f). Plaintiff bases its allegations on investigation of counsel, including interviews with former BCI employees responsible for underwriting, collections, and reporting delinquencies. *See id.* ¶ 20. *See also*

Complaint did not relate back to the original Complaint, this fact issue would remain.

## 2.  Teamsters' Claims Are Not Barred by the Statute of Repose

Defendants argue that Teamsters' claims are barred by the five-year statute of repose of section 804(a)(2) of the Sarbanes-Oxley Act.[142] Teamsters commenced this action on February 7, 2005. Accordingly, defendants move to dismiss all claims arising from alleged misstatements or omissions made prior to February 7, 2000, specifically, claims based on any Prospectus issued before that date.

Teamsters alleges that all misstatements regarding the underwriting practices of BCI which appeared in prospectuses prior to February 7, 2000 were repeated verbatim in January, 2001 in the 2001 Prospectus.[143] In light of Bombardier's reiteration of the alleged misstatements, it does not serve the purpose of a statute of repose to grant immunity to these defendants, who continued their wrongful conduct beyond the time specified by the repose

---

*Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 368 (7th Cir. 1997) (statute of limitations does not begin to run if investor did not have access to facts which would dispel or confirm suspicion).

[142]    28 U.S.C. § 1658(b).

[143]    *See* Am. Compl. ¶¶ 81-90.

period.[144] Furthermore, Teamsters does not allege any distinct claims based on prospectuses issued prior to February 7, 2000, nor does Teamsters attempt to represent plaintiffs that purchased any Certificate prior to February 7, 2000.

Defendants argue that any reliance on the 2001-A Prospectus by purchasers of the 1998, 1999, and 2000 series Certificates was unreasonable, as each Prospectus described a different security collateralized by a different asset pool. However, plaintiff alleges that the reiteration of these detailed underwriting practices and procedures during the class period reassured and induced reliance among investors,[145] and also materially supported the assignment of high bond ratings by ratings agencies.[146] Additionally, the relevant section of each

---

[144]   As Judge Guido Calabresi of the Second Circuit recently observed:

> Giving repose to a defendant who has ceased to do wrong may well be worthwhile even if it is "unfair" to a plaintiff whose cause of action has not yet accrued. But it is a different thing altogether to give repose to a defendant who continued his wrongful conduct, perhaps even beyond the time specified by the repose period.

*P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 107 (2d Cir. 2004) (Calabresi, J., concurring) (statute of repose period began when unregistered security was first bona fide offered to the public, not when the last bona fide offer was made).

[145]   *See* Am. Compl. ¶¶ 8, 82, 84, 86, 89.

[146]   *See id.* ¶¶ 9, 91-95.

40

Prospectus describes the general underwriting policies of BCI and does not provide any distinguishing feature of the underwriting of any particular pool.[147]

Furthermore, plaintiff alleges a series of other material misrepresentations made after February 7, 2000, including omissions in the Form 8-Ks,[148] the September 2001 press release,[149] and the March 2002 annual report.[150] Due to the continuation of material misrepresentations after February 7, 2000, the statute of repose does not bar plaintiff's claims.

### C. The Complaint States a Cause of Action for Securities Fraud Against BCI, BCM, Peters, and Assell

#### 1. Plaintiff Has Sufficiently Pleaded Transaction Causation

Defendants argue that the investing public was aware of the poor performance of the collateral underlying the Certificates at the time Teamsters purchased Certificates in May, 2002.[151] Defendants also argue that Teamsters cannot demonstrate that it relied on the defendants' misstatements because the

---

[147]    *See id.* ¶¶ 82-90.

[148]    *See id.* ¶¶ 18, 30, 32, 33, 96, 116, 120(h).

[149]    *See id.* ¶ 104.

[150]    *See id.* ¶¶ 103, 108, 109.

[151]    *See* Def. Mem. at 34.

truth about the Certificates was well known.[152] In support of their arguments, defendants rely on the same rating agency and analyst reports which they proffered to demonstrate that plaintiff had inquiry notice of its claims. But, as discussed earlier, these reports do not demonstrate that the market was fully aware of the fraudulent scheme alleged by Teamsters.[153] It cannot be said, as a matter of law, that the information available to investors concerning the problems with the collateral was sufficient to overcome the representations of "rigorous underwriting" made by defendants in their offering documents.[154] Although defendants may demonstrate at a later stage of these proceedings that Teamsters cannot rebut the truth on the market defense, its allegations are adequate to permit the case to proceed.

### 2.    Plaintiff Has Sufficiently Pleaded Loss Causation

Plaintiff has alleged that its loss was caused when a risk that was concealed by the defendants materialized in a foreseeable chain of events.[155] The

---

[152]    *See id.* at 33-34.

[153]    Because these reports are not sufficient, at the pleading stage, to constitute inquiry notice, they cannot satisfy the higher standard of the truth on the market defense.

[154]    Am. Compl. ¶¶ 8-9.

[155]    Defendants argue that in order to prove loss causation, a complaint must allege that "a corrective disclosure was revealed to the market" and that there

Complaint alleges that defendants' misrepresentations regarding rigorous underwriting concealed the fact that the collateral pool contained a substantial number of high risk loans.[156] The concealed risk materialized when the collateral pool experienced high delinquency rates and repossession on a sustained basis.[157] Not surprisingly, BCI's earnings expectations then fell.[158] BCI announced that it would write off the losses, rating agencies downgraded the Certificates, and the value of plaintiff's investment declined.[159] These allegations are sufficient to plead loss causation.[160]

### 3. Teamsters Has Sufficiently Pleaded Scienter for BCI, BCM, Peters, and Assell

---

was "a correlating decrease in the price of the Certificates." Def. Mem. at 29. This argument is based on a misreading of this Court's opinions on loss causation. Although an allegation of a corrective disclosure and resulting price decrease may be sufficient to plead loss causation in certain cases, it is not necessary. *See In re Initial Public Offering Sec. Litig.,* 2005 WL 1529659, at *6. *Accord In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 472, 451 (S.D.N.Y. 2005) (plaintiffs had sufficiently pleaded loss causation even though they had *not* pleaded "a corrective disclosure followed by a decline in price").

[156] *See* Am. Compl. ¶¶ 7, 10, 67-79, 82-90.

[157] *See id.* ¶¶ 109-110.

[158] *See id.* ¶ 114.

[159] *See id.* ¶¶ 114-119.

[160] *See Fogarazzo,* 341 F. Supp. 2d at 289 (damages caused by materialization of concealed risk that company was failing).

Teamsters alleges that defendants were reckless because they knew, or had a duty to know, information regarding the quality of the collateral supporting the Certificates suggesting that their public statements were reckless or intentionally false.[161] Teamsters offers the following facts to support its allegations, which must be accepted as true for the purposes of this motion.

### a.   BCI

Teamsters alleges that, on a day-to-day basis, the senior management of BCI directed employees to rapidly generate uncreditworthy loans and created incentives for employees to underreport delinquencies, in violation of their own underwriting guidelines.[162]  In particular, the Complaint alleges that the management team headed by Peace, acting as the agent of BCI, directed employees to disregard the stated underwriting guidelines.[163]  A purposeful failure to follow an announced policy can form the basis for an inference of recklessness.[164]

---

[161]   *See* Am. Compl. ¶¶ 120(f)-(g).

[162]   *See id.* ¶¶ 10-11, 69-76, 83, 85, 87-88, 90, 120(a)-(b).

[163]   *See id.* ¶¶ 10-11.  The scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of section 10(b) and Rule 10b-5.  *See Suez Equity Investors*, 250 F.3d at 100-01.

[164]   *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 77 (defendants failed to follow own accounting standards); *Rothman*, 220 F.3d at 91 (defendants

Teamsters bases these allegations, in part, on interviews with confidential sources, including former BCI employees who worked in underwriting and collections and "were familiar with Bombardier's underwriting and collection practices and procedures, as well as Bombardier's systems for reporting delinquent and foreclosed collateral."[165] The PSLRA permits a plaintiff to rely on confidential sources to plead facts giving rise to a strong inference of scienter, so long as the confidential sources are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."[166] It is probable that former employees working in underwriting would have information regarding the directives of senior management.

Additionally, Teamsters alleges that BCI, as the entity that serviced the collateral, was responsible for reviewing delinquencies, and therefore BCI knew, or should have known, that those loans had been originated in contravention

---

failed to follow announced policy of expensing royalty advances); *Novak,* 216 F.3d at 311 (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy").

[165]    Am. Compl. ¶ 20.

[166]    *Novak,* 216 F.3d at 313-14.

of stated underwriting standards.[167] Drawing all reasonable inferences in favor of the plaintiff, these allegations demonstrate that BCI was aware that its public statements regarding the integrity of its own underwriting standards were false.

### b.    BCM

Teamsters alleges that BCM had the sole operational purpose of "issu[ing]" the Certificates.[168] The misrepresentations concerned the Certificates and were therefore directly attributable to BCM.[169] Although BCI originated substantially all of the Certificate collateral, BCM regularly filed Form 8-K periodic reports with the SEC which detailed the status of the Certificate collateral. Because it filed these reports, BCM had, or should have had, knowledge of the fraudulent underwriting of the Certificate collateral.

### c.    Peters and Assell

The Complaint alleges that Peters, as a director and officer of BCI,

---

[167]    *See* Am. Compl. ¶ 120(c). For example, the Complaint alleges that upon servicing "buy for" loans, agents of BCI would have learned that the occupants of the leased manufactured housing were not the signatories of the loan documents. *See id.*

[168]    *Id.* ¶ 28.

[169]    *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("the fact that [mis]statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made").

signed and supervised the dissemination of false and misleading periodic reports on certain Form 8-Ks filed with the SEC, which related to the performance of the collateral for the Certificates.[170] In order to sign the 8-Ks, Peters had a duty to familiarize himself with the facts relevant to the core operations of BCI, and he should have been aware that the high delinquency rates stemmed from improper underwriting.[171] Similarly, the Complaint alleges that Assell participated and directed the daily operations of BCI, and was the direct supervisor of Peace.[172] As a result, Assell should have been aware of Peace's disregard of underwriting standards.[173]

Defendants argue that Teamsters is required to plead that particular reports were known to Peters and Assell which contradicted their alleged

---

[170] *See* Am. Compl. ¶¶ 32-33.

[171] *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 491 ("As signatories to the SEC filings . . . each individual defendant . . . had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations.") (citation omitted).

[172] *See* Am. Compl. ¶ 34.

[173] *See id. See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 497 (holding that it is reasonable to impute knowledge to a signatory of SEC filings directly involved in the day-to-day operations of the company); *cf. Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374, 1999 WL 101772, at *16 (S.D.N.Y. Mar. 1, 1999) (holding that the plaintiff failed to plead that signatory of SEC filings acted with scienter because he was an outside director who was not involved in the day-to-day operations of the corporation).

47

misrepresentations.[174] However, the cases in which a plaintiff has been required to specify particular reports have been those where "a plaintiff alleges that the defendant made overly optimistic statements and that internal company reports should have alerted the defendant to the falsity of his statements."[175] But Teamsters does not allege overly optimistic statements,[176] nor does it rely on any internal reports.[177] Rather, the Complaint sets forth factual allegations pertaining to both Peters and Assell demonstrating that they had access to information revealing the fraudulent underwriting, which they had a duty to disclose.[178] This is

---

[174]    See Def. Mem. at 30-31 (citing *Novak*, 216 F.3d at 309; *San Leandro Emergency Medical Group Profit v. Philip Morris Co.*, 75 F.3d 801, 812 (2d Cir. 1996)).

[175]    *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 496 (citations omitted).

[176]    See *Rothman*, 220 F.3d at 90 (distinguishing overly optimistic statements from false statements of historical fact).

[177]    See *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 496 ("When a plaintiff takes this approach, it is incumbent upon him to identify sufficiently the internal reports that would have alerted the defendant to the falsity of the statements at issue.").

[178]    See *Rothman*, 220 F.3d at 91 (scienter may be pled by demonstrating a factual basis for the allegation that defendants should have known the falsity of their statements). *Accord In re Carter Wallace Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000) (plaintiffs must allege that defendants had "access to information contradicting their public statements."). Scienter may be inferred from strong circumstantial evidence. *See, e.g., In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 506 (Citigroup's familiarity with Parmalat's billing system provided strong

48

sufficient to plead scienter.

### 4. Teamsters Has Not Sufficiently Pleaded Scienter for BI and Beaudoin

Teamsters argues that it has successfully pleaded scienter for BI and Beaudoin by alleging that they acted with reckless disregard for the truth of their statements.[179] Teamsters alleges that all of the misstatements described in the Complaint are attributable to BI and Beaudoin.[180] Teamsters also alleges that BI's March 19, 2002 Annual Report misrepresented that the cause of ratings downgrades was the "slowdown of the U.S. economy."[181] However, no facts demonstrate that BI and Beaudoin had knowledge of facts contradicting these statements.

Plaintiff asserts that BI and Beaudoin "drove" the fraud through a policy of "rapid fire mobile home loan origination," but offers no facts to show

---

circumstantial evidence from which one could infer that Citigroup knew the system was being misused).

[179]    *See* Lead Plaintiff's Memorandum of Law in Opposition to Defendants Bombardier, Inc, Bombardier Capital Inc., Bombardier Capital Mortgage Securitization Corporation, Laurent Beaudoin, Brian Peters, and Lawrence F. Assell's Motion to Dismiss the First Amended Class Action Complaint ("Opp. Mem."), at 18-19. The Complaint does not attempt to plead scienter for BI and Beaudoin through motive and opportunity.

[180]    *See* Am. Compl. ¶ 36.

[181]    *Id.* ¶¶ 103, 108, 109.

they acted with fraudulent intent.[182] A "'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'"[183] Rapid loan origination cannot be equated with intentional disregard for stated underwriting guidelines, which is the focus of the fraud allegations.[184] The Complaint also asserts that BI and Beaudoin should have known that they could not have acquired such a large volume of loans "absent sacrificing of underwriting standards."[185] Such an allegation may constitute a claim of poor business judgment, but it does not demonstrate fraud.[186]

---

[182]    *See* Opp. Mem. at 38.

[183]    *Rombach,* 355 F.3d at 176 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir. 1994)).

[184]    *See Chill*, 101 F.3d at 270 ("[t]he fact that [defendant] did not automatically equate record profits with misconduct cannot be said to be reckless.").

[185]    Am. Compl. ¶ 120(a).

[186]    *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004) ("While such allegations may demonstrate that [defendants] engaged in risky transactions, they do not rise to the level of depicting manipulative or deceptive conduct within the meaning of the securities laws."); *In re Federated Dept. Stores, Inc. Sec. Litig.,* No. 00 Civ. 6362, 2004 WL 444559, at *6 (S.D.N.Y. Mar. 11, 2004) ("Plaintiffs state an argument here that Defendants were negligent or perhaps violated their state-law duties as directors and officers, but such conduct does not imply knowledge or recklessness."). There is no indication that BI concealed the pacing of its loan origination from the market. If

The Complaint alleges that BI and Beaudoin were involved in the decision to force Peace's resignation on account of his reckless underwriting practices.[187] Additionally, Teamsters alleges that "internally" BI "determined its improper underwriting of the Certificate collateral was so severe and its operations so deficient that it could no longer remain in the business."[188]

Teamsters does not allege the existence of any documents or other facts demonstrating that BI had, in fact, reached this conclusion.[189] Rather, Teamsters appears to base its assertions on "former employees interviewed by counsel."[190] But, these sources are not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by

---

fraud was apparent from this fact alone, plaintiff was on notice of that fraud prior to purchasing the Certificates.

[187]   *See* Am. Compl. ¶¶ 13, 80, 103, 120(d).  Plaintiff alleges that "Beaudoin knew, or recklessly disregarded, the true reasons for the forced resignation of Ronald Peace and Bombardier's exit from the mobile home loan business." *Id.* ¶ 31.

[188]   *Id.* ¶ 103.

[189]   "'A plaintiff cannot base securities fraud claims on speculation and conclusory allegations.'" *Kalnit*, 264 F.3d at 142 (quoting *Chill*, 101 F.3d at 267).

[190]   Am. Compl. ¶ 105.

the source would possess the information alleged."[191]  The Complaint contains no

indication that it would be probable that employees who worked for BCI in

underwriting, collections, and sales[192] would have knowledge of BI's decisions, let

alone those of Beaudoin.

Teamsters alleges that following the removal of Peace, BI "became

even more fully aware of the systematic improper underwriting practices and

underreporting."[193]  Teamsters seems to base this allegation on the fact that after

the Peace management team was replaced, reported delinquencies and

repossessions increased from 8.79% to 25.84%, indicating a previous practice of

significant underreporting.[194]  The Complaint also alleges that BI was aware of the

fraud because it had reported in its March 19, 2002 Annual Report that BCI had

taken a $540 million charge related to its manufactured housing and consumer

---

[191]     *Novak*, 216 F.3d at 313-14. *Accord Gavish v. Revlon, Inc.,* No. 00
Civ. 7291, 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004) ("affixing the
phrase 'former employees have stated' to this otherwise totally unparticularized
allegation does not transform it into an allegation that meets the particularity
requirements of the PSLRA.").

[192]     *See* Am. Compl. ¶ 20.

[193]     *Id.* ¶ 120(e).

[194]     *See id.* ¶¶ 15, 99.

products finance portfolios.[195] However, "[f]raud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [the subsidiary]."[196] Nor is there any allegation that BI was reckless in relying on BCI. "'Intentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls.'"[197]

The Complaint alleges that Beaudoin, as a signatory of BI's Annual Reports between 1998 and 2002, had direct knowledge of the Certificate Offerings.[198] The Complaint alleges that the Certificate Offerings were reflected

---

[195]   *See id.* ¶¶ 108-109.

[196]   *Chill,* 101 F.3d at 270 (citation omitted). *Accord Shields,* 25 F.3d at 1129 (allegations "strongly suggest[ ] that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud"). In *Chill,* the Court of Appeals held that the plaintiff had failed to plead scienter on the part of a parent company, despite a host of "red flags" indicating that the subsidiary's high profits were unusual. *Id.* at 269.

        In its Memorandum of Law, plaintiff alleges that because BI reported that BCI had taken the $540 million special charge related in part to manufactured housing, BI must have reviewed the loan files which would have revealed the underwriting problems. *See* Opp. Mem. at 39. However, this allegation does not appear in the Complaint, nor is it a reasonable inference to draw from the allegation that BI reported that BCI took a special charge.

[197]   *Chill,* 101 F.3d at 271 (quoting *Glickman v. Alexander & Alexander Servs., Inc.,* No. 93 Civ. 7594, 1996 WL 88570, at * 15 (S.D.N.Y. Feb. 29, 1996)). *Accord Novak,* 216 F.3d at 309.

[198]   *See* Am. Compl. ¶ 31.

53

in BI's financial statements, which were incorporated in BI's Annual Reports.[199]

However, the Complaint does not allege that Beaudoin knew of information

contradicting Bombardier's public statements, or that he had a duty to scrutinize

the financial reporting of a subsidiary.[200]  Nor does plaintiff allege that the

Certificate Offerings were a core operation of BI.[201]

## C.  The Complaint States a Claim Under Section 20(a) Against Assell and Peters But Not Against Beaudoin

Teamsters alleges that Assell, Peters, and Beaudoin are controlling

persons within the meaning of section 20(a) who are therefore liable for any

violations of section 10(b) of the Exchange Act and Rule 10b-5 by BI, BCI, and

---

[199]  *See id.*

[200]  Plaintiff asserts that it relies on the "group pleading" doctrine to support its allegation that as "officers and/or directors," each individual defendant had access to adverse undisclosed information regarding the Certificate collateral. Opp. Mem. at 16.  This does not suffice to plead that Beaudoin had such information. *See In re Sotheby's Holdings, Inc. Sec. Litig.,* No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."); *Jacobs,* 1999 WL 101772, at *16-17 ("Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made.").

[201]  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d at 491 (each signatory of SEC filings had a duty to become familiar with the "core operations of the company") (citation omitted).

BCM.[202]  As discussed earlier, I have already found that Teamsters has stated

section 10(b) and Rule 10b-5 claims against BCI and BCM.

## 1.  Assell and Peters

Plaintiff alleges that "because of their positions of control and

authority as officers of [BCI and BCM]," Assell and Peters "had the power and

influence and exercised the same to cause [BCI and BCM] to engage in the illegal

conduct and practices complained of herein."[203]  However, the Complaint does not

rely on status alone, it also alleges that each defendant "control[led] the contents

of the various SEC filings, press releases and other public statements pertaining to

the Certificates and Finance Division operations."[204]  Teamsters specifically

alleges that Assell "directed the daily operations of BCI"[205] and Peters directed

---

[202]   Although Defendants' Memorandum of Law does not specifically
mention Teamsters' claims under section 20(a) of the Exchange Act, this issue
must be addressed because Defendants move to dismiss the Complaint in its
entirety. *See* Defendants Bombardier Inc., Bombardier Capital Inc., Bombardier
Capital Mortgage Securitization Corporation, Laurent Beaudoin, Brian Peters and
Lawrence F. Assell's Motion to Dismiss the First Amended Class Action
Complaint, at 1.

[203]   Am. Compl. ¶¶ 39, 133.

[204]   *Id.* ¶ 39.

[205]   *Id.* ¶ 34.

BCI's financial reporting.[206] Thus, the section 20(a) claims against Assell and Peters are adequately pled.[207]

## 2. Beaudoin

The allegation that Beaudoin was an officer and director of the parent corporation of a primary violator, standing alone, is insufficient to plead a claim under section 20(a).[208] Although the Complaint contains a number of allegations that the "Individual Defendants" had control over the "Company", this is not sufficient to state a claim under section 20(a).[209] Teamsters does not allege

---

[206]    *Id.* ¶ 32.

[207]    Plaintiff has also adequately pleaded that Assell and Peters were primary violators of section 10(b) and Rule 10b-5. "Although a defendant ultimately may not be held liable as both a primary violator and a controlling person, such alternative theories of liability are permissible." *In re Parmalat Sec. Litig.,* 375 F. Supp. 2d at 310 (citations omitted).

[208]    *See* Am. Compl. ¶¶ 33. *Cf. In re Parmalat Sec. Litig.,* 375 F. Supp. 2d at 310 (allegations that defendant was chief executive officer of company which controlled primary violator, and that defendant had resolved disputes among employees of primary violator, was sufficient to state a claim under Section 20(a)).

Plaintiff does not bring a section 20(a) claim against BI.

[209]    Am. Compl. ¶¶ 35-39, 132-133. The Complaint refers to Assell, Beaudoin, Gillespie, and Peters collectively as the "Individual Defendants." *Id.* ¶ 35. The Complaint refers to BI, BCI, and BCM collectively as the "Company." *Id.* ¶ 1.

56

that Beaudoin controlled BCI or BCM, nor does it make any specific allegation of control against him other than his status as an officer and director.[210] Thus, the Complaint does not adequately plead a section 20(a) claim against Beaudoin.

### D. Leave to Amend

Teamsters has requested leave to amend the Complaint in the event of dismissal.[211] Pursuant to Rule 15(a), leave to amend a complaint "shall be freely granted when justice so requires."[212] Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."[213] Teamsters is therefore granted leave to replead within twenty days of this Opinion and Order. Any amended pleading must identify the specific defendant or defendants against

---

[210]   Teamsters' group allegations state that each individual defendant controlled the corporate defendant that he was an officer of, not that *all* individual defendants controlled *all* corporate defendants. Teamsters surely did not mean to allege that the directors of the subsidiaries controlled the parent corporation. Nor is it reasonable to infer from these allegations that Beaudoin controlled BI's subsidiaries. *Cf. In re Solucorp Indus., Ltd. Sec. Litig.,* No. 98 Civ. 3248, 2000 WL 1708186, at *7 (S.D.N.Y. Nov. 15, 2000) (allowing group pleading of a section 20(a) claim where complaint alleged that each individual defendant had power and influence over Solucorp Industries, the primary violator).

[211]   *See* Opp. Mem. at 40 n.29.

[212]   Fed. R. Civ. P. 15(a).

[213]   *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991).

whom an allegation is made.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied as to BCI, BCM, Peters, and Assell, but granted as to BI and Beaudoin, without prejudice, and with leave to replead within twenty days of receipt of this Opinion and Order.  The Clerk of the Court is directed to close the motion [Docket #16].  A conference is scheduled for September 15, 2005, at 2:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
       September 6, 2005

## - Appearances -

**For Plaintiff:**

Joel P. Laitman, Esq.
SHOENGOLD, SPORN, LAITMAN & LOMETTI, P.C.
Cannon's Walk
19 Fulton St., Suite 406
New York, New York 10038
(212) 964-0046

**For Defendants:**

A. Robert Pietrzak, Esq.
SIDLEY AUSTIN BROWN & WOOD LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300