USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/1/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- X
                                     :
**TEAMSTERS LOCAL 445 FREIGHT**      :
**DIVISION PENSION FUND, on its own behalf** :
**and on behalf of all those similarly situated,** :
                                     :
              **Plaintiff,**         :
                                     :     **OPINION AND ORDER**
      - against -                    :
                                     :     **05 Civ. 1898 (SAS)**
**BOMBARDIER, INC., BOMBARDIER**     :
**CAPITAL, INC., BOMBARDIER CAPITAL** :
**MORTGAGE SECURITIZATION**          :
**CORPORATION, LAURENT BEAUDOIN,**   :
**BRIAN PETERS, ROBERT GILLESPIE, and** :
**LAWRENCE ASSELL,**                 :
                                     :
              **Defendants.**        :
----------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

### I.    INTRODUCTION

Teamsters Local 445 Freight Division Pension Fund ("Teamsters")

brings this putative class action on behalf of open market purchasers of certain

Certificates offered by Bombardier Capital Mortgage Securitization Corporation

("BCM") and Bombardier Capital, Inc. ("BCI"). Teamsters alleges that

defendants engaged in a scheme to defraud investors by misrepresenting the

-1-

integrity of the Certificate collateral.[1] Teamsters seeks relief under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission ("SEC").[2]

Teamsters seeks an order to certify this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.[3] Although several of Teamsters' arguments in favor of class certification are vigorously disputed,[4] the linchpin of Teamsters' motion — and the focus of the parties' briefs and expert reports — is the efficiency of the market for the Certificates. If the

---

[1]    The Certificates were secured by pools of manufactured housing installment sales contracts and mortgage loans. *See* Second Amended Class Action Complaint ("Compl.") ¶¶ 2, 5; Answer of Defendant Bombardier Inc. to Second Amended Class Action Complaint ("Answer") ¶¶ 2, 5. The Answers to the Second Amended Complaint submitted by several defendants are substantially identical; therefore, this Opinion will cite only to the Answer of defendant Bombadier, Inc. ("BI").

[2]    15 U.S.C. §§ 78j(b), 78t(a) (2006); 17 C.F.R. § 240.10b-5 (2006).

[3]    Teamsters also moves for its appointment as class representative, and for the approval of Teamsters' selection of Schoengold Sporn Laitman & Lometti, P.C. as class counsel, pursuant to Federal Rule of Civil Procedure 23(g)(1). *See* Lead Plaintiff Teamsters Local 445 Freight Division Pension Fund's Memorandum of Law in Support of Its Motion for Class Certification ("Pl. Mem.") at 1.

[4]    Specifically, Bombardier challenges Teamsters' proposed class on the grounds of typicality, adequacy, predominance, and superiority. *See* Memorandum of Law in Opposition to Lead Plaintiff Teamsters Local 445 Freight Division Pension Fund's Motion for Class Certification ("Def. Mem.") at 8-25.

market is *inefficient*, then Teamsters may not avail itself of the presumption that investors relied on defendants' misrepresentations, the requirement that common issues predominate over individual issues will not be satisfied, and class certification must be denied. If the market is *efficient*, then Teamsters may rely on the presumption, common issues will predominate, and class certification will be granted so long as Teamsters satisfies the other Rule 23 requirements.

## II. BACKGROUND

On May 10, 2002, Teamsters purchased $250,000 par value Series 2000-A Class A-2 Certificates — issued by BCM and BCI — for a total investment of $234,826.[5] On February 3, 2006, Teamsters filed a Second Amended Complaint[6] pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, defining a putative class of all open-market purchasers of Series 1998-A, 1998-B, 1998-C, 1999-A, 1999-B, 2000-A, and 2001-A Certificates (the "Certificates"), who purchased their shares between February 7, 2000 and

---

[5]     *See* Compl. ¶ 25.

[6]     Teamsters filed this Complaint after I partially granted Bombardier's motion to dismiss. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005). Familiarity with this Opinion is assumed.

-3-

February 7, 2005 (the "Class Period").[7]

BI is a Canadian corporation principally engaged in the manufacture and sale of aircraft, recreational vehicles, railroad trains, and locomotive engines.[8] BCI, a wholly owned subsidiary of BI, is a financial services company principally engaged in the financing and leasing of BI's products, as well as the financing and leasing of manufactured housing (also known as mobile homes) to consumers.[9] Plaintiff alleges that the sole purpose of BCM, a wholly owned limited purpose subsidiary of BCI, was to issue the Certificates.[10] BI, BCM, and BCI will hereafter be referred to collectively as "Bombardier." The individual defendants were all officers and/or directors of one of the Bombardier entities during at least part of the period in which the alleged fraud took place.[11]

Teamsters alleges that, beginning in 1997, Bombardier rushed to originate mobile home loans and then, between January 1998 and January 2001, packaged these loans for issuance in the asset-backed securities market through a

---

[7]     *See* Compl. ¶ 41.

[8]     *See id.* ¶¶ 26, 58; Answer ¶¶ 26, 58.

[9]     *See* Compl. ¶¶ 27, 58; Answer ¶¶ 27, 58.

[10]    *See* Compl. ¶¶ 28, 30; Answer ¶¶ 28, 30.

[11]    *See* Compl. ¶¶ 32-34.

-4-

number of separate certificate offerings.[12] Each series of Certificates had the same

basic structure and was divided into classes, each of which was assigned specific

pools of mobile home collateral and matured on different dates.[13]

From 1998 to 2001, Bombardier allegedly issued false statements to

investors regarding the "strict and prudent" underwriting standards used in the

origination of the collateral supporting the Certificates.[14] The Certificate Offering

Document, or Prospectus, for each series of Certificates contained an identical

description of underwriting standards.[15] Each Prospectus stated that Bombardier's

Credit Department would adhere, with limited deviation, to certain underwriting

guidelines, such as requiring each loan applicant to demonstrate stability of

employment and residence, excluding applicants with debt-to-income ratios in

excess of forty-five percent, and applying the Fair Isaac Credit Organization

("FICO") credit scoring system.[16] Each Prospectus also disclosed the delinquency

rates for the loans constituting the collateral for the Series 2000-A offering as two

---

[12]    *See* Compl. ¶¶ 4-7.

[13]    *See id.* ¶ 5 n.1; Answer ¶ 5(ii).

[14]    Compl. ¶ 7.

[15]    *See id.*

[16]    *See id.*

-5-

percent in 1998 and 8.14% in January 2000.[17] These "purported rigorous underwriting standards" and delinquency disclosures contributed to the assignment of high ratings to the Certificates by various rating agencies.[18] Additionally, this description of Bombardier's underwriting guidelines, repeated in each Prospectus, was the only description of the origination of Certificate collateral on which purchasers relied.[19]

Teamsters alleges that, in fact, BCI's senior management disregarded underwriting standards in favor of volume loan purchases, infecting the pool of collateral with loans to "patently uncreditworthy" borrowers.[20] Bombardier recruited a senior management team, including Dan Stout, who allegedly directed employees to focus on loan volume and disregard underwriting standards.[21] Bombardier systematically purchased "large quantities of facially defective and deficient mobile home loans," including loans to applicants with no assets, no

---

17    *See id.*

18    *Id.* ¶ 9.

19    *See id.* ¶ 8.

20    *Id.* ¶ 10.

21    *See id.* ¶¶ 10, 67-73; Answer ¶ 67.

-6-

evidence of employment, debt exceeding income, and poor FICO scores.[22] Additionally, by linking low reports of delinquencies and repossessions to employee compensation, the management of BCI created incentives for underreporting.[23] At Stout's direction, repossessions were re-categorized as "re-financings" in order to avoid reporting.[24] For these reasons, Bombardier's reported delinquency figures were systematically understated, and Bombardier's allegedly systematic practice of purchasing "bad paper" through reckless underwriting led to a rapid increase in the percentage of delinquencies.[25]

In early 2000, Bombardier replaced its senior management team and disclosed certain understatements of delinquencies, claiming that the problems had been corrected.[26] Bombardier did not, however, disclose its improper underwriting

---

[22]    Compl. ¶ 69. For example, Bombardier allegedly purchased pools of high risk "buy for" loans made to applicants who did not intend to live in the mobile homes or make the payments. *See id.* ¶¶ 77-78. Plaintiff alleges that "buy for" loans are high risk because the Fair Debt Collection Act prohibits discussion of the loans with any third party, thereby prohibiting contact with the occupant of manufactured housing without the borrower's consent. *See id.* ¶ 78 (citing 15 U.S.C. § 1692(c)).

[23]    *See id.* ¶¶ 10-12, 74-76.

[24]    *Id.* ¶¶ 12, 74-76.

[25]    *Id.* ¶¶ 73, 75.

[26]    *See id.* ¶¶ 12-14, 97.

-7-

practices between 2001 and 2003.[27] In the Series 2001-A Prospectus supplement, BCI and BCM explained worsened delinquency rates as arising from collection problems.[28] In September, 2001, Bombardier left the manufactured housing asset-backed securities industry and, in a press release, attributed the cause of its exit to market conditions.[29] In its March 19, 2002 Annual Report, BI explained portfolio downgrades by reference to the "slowdown of the U.S. economy."[30]

On December 16, 2002, the Series 2000-A Certificates were downgraded below investment grade.[31] On December 27, 2002, Certificate prices declined by an average of 13.25%.[32] On February 25, 2003, the 1998-C and 1999-A Series Certificates were downgraded below investment grade.[33] On March 5, 2003, the Certificates declined an average of twenty-seven percent, resulting in an average price decline of thirty-eight percent from December 24, 2002.[34]

---

27    *See id.* ¶¶ 18, 103, 120(h).

28    *See id.* ¶ 100.

29    *See id.* ¶¶ 16, 104.

30    *Id.* ¶¶ 103, 108, 109.

31    *See id.* ¶ 17; Answer ¶ 17.

32    *See* Compl. ¶ 17.

33    *See id.*; Answer ¶ 17.

34    *See* Compl. ¶ 17.

## III. APPLICABLE LAW

### A. Class Certification Requirements

#### 1. Elements of Rule 23

Rule 23 of the Federal Rules of Civil Procedure governs class certification. To be certified, a putative class must meet all four requirements of Rule 23(a) as well as the requirements of one of the three subsections of Rule 23(b). In this case, as in most cases seeking money damages, Teamsters bear the burden of demonstrating that the class meets the requirements of Rule 23(a) — referred to as numerosity, commonality, typicality, and adequacy[35] — and that the action is "maintainable" under Rule 23(b)(3).[36] Under Rule 23(b)(3) — the relevant subsection of Rule 23(b) — "common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be demonstrably "superior" to other methods of adjudication.[37]

The numerosity requirement mandates that the class be "so numerous

---

[35]   *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999).

[36]   *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

[37]   Fed. R. Civ. P. 23(b)(3).

that joinder of all members is impracticable."[38] Commonality requires a showing that common issues of fact or law affect all class members.[39] A named plaintiff's claims are "typical" where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendants' liability.[40] The adequacy requirement demands that "the representative parties will fairly and adequately protect the interests of the class."[41] Finally, although "'Rule 23(a) does not expressly require that a class be definite in order to be certified[,] a requirement that there be an identifiable class has been implied by the courts.'"[42]

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to

[38] Fed. R. Civ. P. 23(a)(1).

[39] *See* Fed. R. Civ. P. 23(a)(2); *see also Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992).

[40] *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001).

[41] Fed. R. Civ. P. 23(a)(4).

[42] *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 336 (quoting *Zapka v. Coca-Cola Co.*, No. 99 Civ. 8238, 2000 WL 1644539, at *2 (N.D. Ill. Oct. 27, 2000)). This implied requirement is often referred to as "ascertainability." *Id.* (citing *Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448, 451 (D.R.I. 2001)).

generalized proof, and thus applicable to the class as a whole ... predominate over

those issues that are subject only to individualized proof."[43] The superiority prong

of Rule 23(b)(3) requires a court to consider whether a class action is superior to

other methods of adjudication.[44] The court should consider, *inter alia*, "the

interest of the members of the class in individually controlling the prosecution or

defense of separate actions" and "the difficulties likely to be encountered in the

management of a class action."[45]

## 2. Standard of Proof

Although the standard of proof under which the elements of Rule 23

should be analyzed has not been precisely defined, certain basic principles apply.

In particular, courts should not assume that the allegations contained in the

complaint are true when deciding a motion for class certification.[46] Instead, courts

[43] *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) ("*In re Visa Check*") (quotations and citations omitted).

[44] *See* Fed. R. Civ. P. 23(b)(3); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

[45] Fed. R. Civ. P. 23(b)(3).

[46] *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 91 (S.D.N.Y. 2004), *appeal docketed sub nom.*, *Miles v. Merrill Lynch & Co.*, 05-3349-cv (2d Cir. June 30, 2005) ("*In re IPO*") (citing *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) ("*Falcon*")). This differs from the rule governing a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212,

-11-

must conduct a "rigorous analysis" to determine whether the plaintiffs have satisfied each element of Rule 23.[47] This heightened standard requires courts to "probe behind the pleadings" to determine whether class certification is warranted.[48] Nevertheless, courts generally must not assess the merits of the underlying claims.[49]

The Second Circuit's recent decision in *Heerwagen v. Clear Channel Communications* can be read to establish two standards of proof for class certification. Where the particular issue being considered as part of the Rule 23 inquiry is "sufficiently independent of the merits to justify weighing the evidence," the plaintiff must prove that issue by a preponderance of the evidence.[50] But where the Rule 23 issue being considered is "effectively identical" to the

---

217 (2d Cir. 2004) ("[The court] must accept as true the allegations contained in the complaint and draw all reasonable inferences in favor of the nonmoving party.").

[47] *Falcon*, 457 U.S. at 161 (quotation omitted).

[48] *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 231 (2d Cir. 2006) (citing *Falcon*, 457 U.S. at 160).

[49] *See id.* at 233 (holding that courts should not weigh competing evidence at the class certification stage to the extent that such weighing would result in an inappropriate consideration of the merits).

[50] *Id.*

-12-

merits,[51] the plaintiff must make only "some showing" that the disputed element of Rule 23 is satisfied.[52] Under the latter standard, courts "may not weigh conflicting expert evidence or engage in 'statistical dueling' of experts."[53] Instead, the *sole* job of a court in assessing expert evidence is to "ensure that the basis of the [plaintiff's] expert opinion is not so flawed that it would be inadmissible as a matter of law."[54]

## B. Elements of Teamsters' Claims

### 1. In General

To state a prima facie case for securities fraud under section 10(b) and Rule 10b-5, a plaintiff must allege that "'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action

---

[51]   *Id.* at 232.

[52]   *In re Salomon Analyst Metromedia Litig.*, — F.R.D. —, No. 02 Civ. 7966, 2006 WL 1716873, at *2 (S.D.N.Y. June 20, 2006). *Accord In re Visa Check*, 280 F.3d at 134-35; *In re IPO*, 227 F.R.D. at 93 ("That showing may take the form of . . . expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint.").

[53]   *In re Visa Check*, 280 F.3d at 134-35 (quoting *Caridad*, 191 F.3d at 291).

[54]   *Id.* at 135.

caused injury to the plaintiff.'"[55] The requisite state of mind, or scienter, in a

securities fraud action is "'an intent to deceive, manipulate or defraud.'"[56]

## 2. Transaction Causation

As already noted, the decisive issue presented by this motion is

whether the element of reliance (i.e. transaction causation) can be established

through common proof.[57] Bombardier challenges Teamsters' proposed class on

the grounds that, inter alia, individualized questions of transaction causation will

predominate over common questions. "Transaction causation . . . requires only an

allegation that 'but for the claimed misrepresentations or omissions, the plaintiff

would not have entered into the detrimental securities transaction.'"[58] In order to

---

[55]     *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino
v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)). *See also Dura Pharm.,
Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (holding that the basic elements of
10b-5 action are "a material misstatement or omission, scienter . . ., a connection
with the purchase or sale of a security, reliance. . ., economic loss; and 'loss
causation'") (citations omitted).

[56]     *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425
U.S. 185, 193 n.12 (1976)).

[57]     *See* Fed. R. Civ. P. 23(b)(3). *See also In re Visa Check*, 280 F.3d at
136 ("In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff
must establish that the issues in the class action that are subject to generalized
proof, and thus applicable to the class as a whole . . . predominate over those
issues that are subject only to individualized proof.").

[58]     *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)
(quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d

-14-

satisfy the predominance requirement of Rule 23(b)(3) on the issue of transaction

causation, Teamsters must avail itself of a presumption of reliance under either of

the following two theories: the *Affiliated Ute* presumption or the fraud on the

market (*Basic*) presumption.

### a.    The *Affiliated Ute* Presumption

Teamsters argues that it is exempt from the requirement to prove

reliance based on *Affiliated Ute Citizens v. United States*, in which the Supreme

Court held that in securities fraud cases "involving *primarily* a failure to disclose,

positive proof of reliance is not a prerequisite to recovery . . . [instead, all] that is

necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered them important in the making of [his or her]

decision."[59] Distinguishing between omissions and affirmative misstatements,

however, is no simple task.[60]

Thus, in determining whether a claim primarily involves an omission

189, 197 (2d Cir. 2003)).

[59]    406 U.S. 128, 153-54 (1972) (emphasis added).

[60]    *See, e.g.*, *In re Salomon Analyst Metromedia Litig.*, 2006 WL
1716873, at *9 (citing *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d
Cir. 1981)); *see also In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446
(S.D.N.Y. 2006) (holding that in certain circumstances a half-truth constitutes an
omission).

-15-

for purposes of the *Affiliated Ute* exception, "[w]hat is important is to understand

the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in

which no positive statements exist: reliance as a practical matter is impossible to

prove."[61] Where positive statements are central to the alleged fraud, thereby

eliminating the evidentiary problems inherent in proving reliance on an omission,

the *Affiliated Ute* presumption does not apply.[62]

## b. The Fraud on the Market (*Basic*) Presumption

Teamsters also argues that it is entitled to a presumption of reliance

under the "fraud on the market" theory, which is

> based on the hypothesis that, in an open and developed securities
> market, the price of a company's stock is determined by the
> available material information regarding the company and its

---

[61] *Wilson*, 648 F.2d at 93. *See also Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988) ("Requiring a plaintiff to show . . . how he would have acted if omitted material information had been disclosed . . . would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff . . . ."); *Du Pont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) ("'[I]n instances of total non-disclosure . . . it is of course impossible to demonstrate reliance.'") (quoting *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975)).

[62] *See Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (when "[p]laintiff's principal objection to the omissions . . . is that [they] exacerbated the misleading nature of the affirmative statements," the *Affiliated Ute* presumption does not apply); *see also In re Salomon Analyst Metromedia Litig.*, 2006 WL 1716873, at *9 ("[A]ffirmative misleading statements always omit something; namely, they omit the information that would correct or mitigate their misleading nature and thereby render the statements true.").

-16-

> business. . . . Misleading statements will therefore defraud
> purchasers of stock even if the purchasers do not directly rely on
> the misstatements. . . . The causal connection between the
> defendants' fraud and the plaintiffs' purchase of stock in such a
> case is no less significant than in a case of direct reliance on
> misrepresentations.[63]

"The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic v.*

*Levinson*, creates a rebuttable presumption that (1) misrepresentations by an issuer

affect the price of securities traded in the open market, and (2) investors rely on

the market price of securities as an accurate measure of their intrinsic value."[64]

The fraud on the market presumption applies only if the market for

the security is open and developed enough so that it quickly incorporates material

information into the price of the security, *i.e.*, the market must be *efficient*.[65]

---

[63]    *Basic*, 485 U.S. at 241-42 (quotations and citations omitted,
alterations in original).

[64]    *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[65]    *See, e.g., Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th
Cir. 1990) ("The fraud on the market theory rests on the assumption that the price
of an actively traded security in an open, well-developed, and efficient market
reflects all the available information about the value of a company.") (citation
omitted).  The relevant economic terms have been defined as follows:

> An open market is one in which anyone, or at least a large number
> of persons, can buy or sell. . . . A developed market is one which
> has a relatively high level of activity and frequency, and for
> which trading information (*e.g.*, price and volume) is widely
> available. . . . An efficient market is one which rapidly reflects

Although the Second Circuit has not adopted a test for determining whether the

market for a security is efficient, courts typically consult some or all of the

following factors:

> (1) the average weekly trading volume expressed as a percentage
> of total outstanding shares; (2) the number of securities analysts
> following and reporting on the stock; (3) the extent to which
> market makers and arbitrageurs trade in the stock; (4) the
> company's eligibility to file SEC registration Form S-3 (as
> opposed to Form S-1 or S-2); (5) the existence of empirical facts
> showing a cause and effect relationship between unexpected
> corporate events or financial releases and an immediate response
> in the stock price; (6) the company's market capitalization; (7) the
> bid-ask spread for stock sales; and (8) float, the stock's trading
> volume without counting insider-owned stock.[66]

---

> new information in price. These terms are cumulative in the
> sense that a developed market will almost always be an open one.
> And an efficient market will almost invariably be a developed
> one.

*Cammer v. Bloom*, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989) (quoting Alan R.
Bromberg & Lewis D. Lowenfels, 4 *Securities Fraud and Commodities Fraud* §
8.6 (1988) ("Bromberg & Lowenfels")).

[66]     *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (internal
quotation omitted, citing *Cammer*, 711 F. Supp. at 1286-87 (the first five factors);
*Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) (the last three
factors)). Several courts have used this approach. *See Stuebler v. Xcelera.com (In
re Xcelera.com Sec. Litig.)*, 430 F.3d 503, 512-16 (1st Cir. 2005) (using the five
*Cammer* factors); *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (same);
*In re IPO*, 227 F.R.D. at 107 n.323 (same); *O'Neil v. Appel*, 165 F.R.D. 479, 503
(W.D. Mich. 1996) (suggesting additional factors from the economic literature to
supplement the *Cammer* approach). *But see* Alon Brav & J. B. Heaton, *Revisiting
the Mechanisms of Market Efficiency: Market Indeterminacy*, 28 Iowa J. Corp. L.

Courts should use these factors as an analytical tool rather than as a checklist.[67]

Because the resolution of the instant motion depends to a great extent on the

efficiency of the market for mortgage-backed securities, it is critical to examine

the theory behind market efficiency as well as the relevant factors used by courts

to ascertain whether a market is efficient.[68]

### (i) Definition of Market Efficiency

Market efficiency refers to "the flow of information in the relevant

market" and its effect on the price of the security.[69] An efficient market absorbs

517, 536 (2003) ("[T]here are no tests for [determining market efficiency] that are generally accepted in the academic finance profession. Nor do such analyses rest on a testable methodology with a known rate of error since we have no way of determining how often the presence or absence of these factors misidentifies efficient stocks as inefficient or vice versa.").

[67]     *See, e.g.*, *Unger*, 401 F.3d at 325.

[68]     Neither Teamsters nor Bombardier discussed the final three factors set forth above (market capitalization, bid-ask spread, and float). In any case, because the Certificates are not equities, these factors are not relevant here. Thus, I will consider only the first five factors (the "*Cammer* factors"). For an explanation of the remaining three factors and their application to the market efficiency question, *see Krogman*, 202 F.R.D. at 477-78.

[69]     *Bowe v. PolyMedica Corp. (In re PolyMedica Corp. Sec. Litig.)*, 432 F.3d 1, 19 (1st Cir. 2005). *Accord In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989) (stating that "the fraud on the market theory assumes that the market is a transmission belt which efficiently translates all information concerning a security," including misleading information, "into a price.").

-19-

misrepresentations into the price of the security; an inefficient market does not.[70]

The fraud on the market presumption is grounded in two econometric models —

the efficient market hypothesis ("EMH") and the market model of investment

decision-making.[71]

As the First Circuit recently explained in *In re PolyMedica*

*Corporation Securities Litigation*, "the efficient market hypothesis began as an

academic attempt to answer the following question: Can an ordinary investor beat

the stock market, that is, can such an investor make trading profits on the basis of

---

[70]    *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 19-20; *see also Freeman*, 915 F.2d at 198 ("[A]n inefficient market, by definition, does not incorporate into its price all the available information about the value of a security. Investors, therefore, cannot be presumed to rely reasonably on the integrity of the market price of a security that is traded in such a market.").

[71]    *See* Note, *The Fraud on the Market Theory: Efficient Markets and the Defenses to an Implied 10b-5 Action*, 70 Iowa L. Rev. 975, 979-85 (1985). The market model of investment decision-making, which is not relevant to the instant motion, assumes that the marketplace is divided between professional and nonprofessional investors. Because of high opportunity costs, nonprofessional investors will not obtain a positive marginal return on their attempt to gain superior knowledge of a security. In contrast, the traditional model of investment decision-making assumes that investors will analyze all information concerning a security before making an investment decision. *See generally* Daniel R. Fischel, *The Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Law. 1, 2-5 (1982) ("Fischel"). At least one court has refused to apply the fraud on the market presumption when professional investment decisions did not affect market price. *See In re Bexar County Health Facility Dev. Corp. Sec. Litig.*, 130 F.R.D. 602, 607 (E.D. Pa. 1990).

-20-

new information?"[72] In an efficient market, the answer is "no," because the market price already reflects the new information.[73] Scholars acknowledge that an "efficient" market cannot be perfectly efficient, because it takes time for the price of a security to incorporate new information.[74] From a legal standpoint, however,

---

[72] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 8.

[73] *See id. See also* Lynn A. Stout, *The Mechanisms of Market Inefficiency: An Introduction to the New Finance*, 28 Iowa J. Corp. L. 635, 639 (2003) ("Stout") ("[T]he common definition of market efficiency . . . is really a shorthand for the empirical claim that 'available information' does not support profitable trading strategies or arbitrage opportunities.") (citations omitted). *But cf. id.* at 640 n.24 (stating that this rule cannot be absolutely true, or no one would have incentive to trade on information in a way that leads to the incorporation of that information into prices).

[74] Some economists have termed this time variable the "Efficiency Paradox." *See* Louis Loss & Joel Seligman, *Securities Regulation* 181-82 n.41 (3d ed. 1992) ("Loss & Seligman"):

> [A] perfectly efficient market is impossible because securities analysts and other market professionals cannot be expected to gather information beyond the point at which they can earn a positive return. Hence an 'equilibrium level of disequilibrium' should be normal in which securities prices reflect new information rapidly, but not so quickly that market professionals cannot earn a positive return.

*See also* Richard A. Booth, *The Efficient Market, Portfolio Theory, and the Downward Sloping Demand Hypothesis*, 68 N.Y.U. L. Rev. 1187, 1195 (1993) ("[I]nvestors invest in research until the marginal return from research equals the marginal cost."). At least one court has found that a time lag of seven to ten days is "inconsistent with the concept of market efficiency." *Krogman*, 202 F.R.D. at 477.

-21-

defendants are liable for defrauding investors when a misrepresentation caused the price of a security to differ from its efficient price, which "is presumed to reflect the price at which the security would have traded in the absence of the misleading information."[75]

Economists have identified three forms of EMH: weak, semi-strong, and strong — each of which makes a progressively stronger claim about the kind of information that the security price reflects. Under the weak form, the price of a security reflects historical price data. Under the semi-strong form, the price of a security reflects all public information. Under the strong form, the price of a security reflects all information.[76]

According to the "prevailing" definition of market efficiency, "an efficient market is one in which market price fully reflects *all* publicly available

---

[75] *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1478-79 (N.D. Cal. 1992) (citing *Basic*, 485 U.S. at 246). *See also* Comment, Robert G. Newkirk, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context*, 58 U. Chi. L. Rev. 1393, 1422 (1991) ("Newkirk") (to avail themselves of the fraud on the market presumption, plaintiffs should be required to prove only that, absent the alleged fraud, the market price would be unbiased, not that it would be infallible).

[76] *See* Loss & Seligman at 181-82 n.41.

information."[77] This definition comports with the semi-strong form of the EMH.[78]

The Supreme Court in *Basic*, however, held that an "efficient" market is one in

which "market professionals generally consider *most* publicly announced material

statements about companies, thereby affecting stock market prices."[79]

### (ii) Characteristics of an Efficient Market

#### (a) Trading Volume

A high average trading volume suggests market efficiency, because it

implies that there is "significant investor interest in the company" and "a

likelihood that many investors are executing trades on the basis of newly available

or disseminated corporate information."[80] *Cammer* provides that "'turnover

---

[77] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 10 (emphasis added)
(citation omitted). *But see* Recent Case, *Securities Law — Fraud-on-the-Market
— First Circuit Defines an Efficient Market for Fraud-on-the-Market Purposes*,
119 Harv. L. Rev. 2284, 2284 (2006) (arguing that the *PolyMedica* standard loses
sight of the goals of *Basic* because it "forces lower courts to determine whether a
real-world market conforms at the margins to a definition of efficiency adopted
from efficient capital markets scholarship").

[78] *See, e.g., id.* at 10 n.16; Jonathan R. Macey & Geoffrey P. Miller,
*Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*,
42 Stan. L. Rev. 1059, 1077-79 (1990) (holding that both strong-form and
weak-form EMH are incompatible with the fraud-on-the-market theory).

[79] *Basic*, 485 U.S. at 246 n.24 (emphasis added).

[80] *Cammer*, 711 F. Supp. at 1286. *Accord Unger*, 401 F.3d at 324 ("A
high weekly stock trading volume suggests the presence of active, informed
investors."). *See also Krogman*, 202 F.R.D. at 474 ("This indicator appears to be

-23-

measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[81]

## (b) Analysts

If a large number of financial analysts report on the stock, one can infer that financial statements are "closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[82] Although sporadic commentary by news reporters "cannot substitute for serious

_____

one of the most important in gauging the efficiency of the market for a particular stock.") (citation omitted)). Trade volume, however, can be grossly exaggerated on some exchanges through double-counting, sometimes by over fifty percent, *see* M. Barclay & F. Torchio, *A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation*, 64 Law & Contemp. Probs. 105, 106 (2001). Accordingly, courts should not rely on "unverifiable evidence" or "bare allegations" regarding trading activity. *Unger*, 401 F.3d at 324.

[81] *Cammer*, 711 F. Supp. at 1286 (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud* § 8.6). *Accord In re Xcelera.com Sec. Litig.*, 430 F.3d at 514 (citing *O'Neil*, 165 F.R.D. at 508).

[82] *Cammer*, 711 F. Supp. at 1286. *Accord In re Xcelera.com Sec. Litig.*, 430 F.3d at 514 ("[T]he greater the number of securities analysts following and reporting on a company's stock, the greater the likelihood that information released by a company is being relied upon by investors."); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (stating that analyst coverage is a "persuasive factor"); *Krogman*, 202 F.R.D. at 475 (holding that the existence of one analyst and coverage by Moody's and similar publications is insufficient to cause this factor to weigh in favor of market efficiency).

attention by professional securities analysts,"[83] it is not necessary for "'big name' Wall Street companies" to follow the security.[84]

### (c) Market Makers and Arbitrageurs

A market-maker is "one who helps establish a market for securities by reporting bid-and-asked quotations" (the price a buyer will pay for a security and the price a seller will sell a security),[85] and who "stands ready to buy or sell at these publicly quoted prices."[86] Arbitrageurs are "professional investors who exploit price differences in different markets by buying and selling identical securities in those markets."[87] Market makers and arbitrageurs contribute to market efficiency by "reacting swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[88]

[83]     *O'Neil*, 165 F.R.D. at 501.

[84]     *Levine v. SkyMall Inc.*, No. Civ. 99-166-PHX-ROS, 2002 WL 31056919, at *5 (D. Ariz. May 24, 2002).

[85]     *Black's Law Dictionary* 990 (8th ed. 1999) (defining "market-maker").

[86]     *Lehocky v. Tidel Techs.*, 220 F.R.D. 491, 508 n.24 (S.D. Tex. 2004).

[87]     *In re Xcelera.com Sec. Litig.*, 430 F.3d at 515 n.13 (citing *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 9).

[88]     *Cammer*, 711 F. Supp. at 1287. *But see Krogman*, 202 F.R.D. at 476 ("[T]he mere presence of market makers does not indicate market efficiency"); *O'Neil*, 165 F.R.D. at 501-02 (stating that without knowing "the volume of shares

One way that efficient markets absorb information is through arbitrageurs, whose actions stabilize the market so as to eliminate arbitrage opportunities.[89] The capacity of arbitrageurs to "seek out new information and evaluate its effects on the price of securities" distinguishes them from ordinary investors, who "lack the time, resources, or expertise to evaluate all the information concerning a security," and are thus "unable to act in time to take advantage of opportunities for arbitrage profits."[90] In an efficient market, an ordinary investor "who becomes aware of publicly available information cannot make money by trading on it," because the market will have already incorporated

that they committed to trade, the volume of shares they actually traded, and the prices at which they did so," the existence of a large number of market makers is meaningless).

[89]    *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 9; *see also Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1129 (7th Cir. 1993) ("[C]ompetition among savvy investors leads to a price that impounds all available information . . . ."); Stout at 638 n.15 (noting that if arbitrageurs observe a difference between price and value, "they immediately eliminate it by their trading") (quotations and citations omitted). The following is an example of an arbitrage opportunity. Assume that the price of gold trading on the New York market was $502/oz., while the price on the London market was only $500/oz. An arbitrageur could "short" an ounce of gold in New York, receiving $502 in return, and then purchase an ounce of gold in London for $500, making a profit of two dollars. In an efficient market, however, the New York and London prices will swiftly equalize as arbitrageurs exploit the imbalance.

[90]    Newkirk, 58 U. Chi. L. Rev. at 1409.

the information through the actions of the arbitrageurs.[91]

### (d) SEC Registration Form S-3

Courts have considered a company's eligibility to file an S-3 Registration Statement as "an 'extremely important' factor in determining whether a company's stock trades in an efficient market."[92] Companies permitted by the SEC to file an S-3 Registration Statement, an abbreviated prospectus requiring fewer disclosures than Forms S-1 or S-2, are those that meet the $75 million market capitalization requirement and have filed reports with the SEC for twelve consecutive months.[93] By contrast, there is no minimum capitalization requirement to file either Form S-1 or S-2. Courts have found that the SEC permits an S-3 Registration Statement "only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary."[94] Even though the SEC relaxed its requirements for S-3 eligibility

---

[91] Stout at 640.

[92] *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000) (citing *O'Neil*, 165 F.R.D. at 502). *Accord Levine v. SkyMall, Inc.*, No. Civ. 99-166-PHX-ROS, 2001 U.S. Dist. 24705, at *21 (D. Ariz. May 24, 2001).

[93] *See* 17 C.F.R. § 239.13 (2006).

[94] *O'Neil*, 165 F.R.D. at 502. *Accord Krogman*, 202 F.R.D. at 477; *Cammer*, 711 F. Supp. at 1287.

-27-

after the *Cammer* decision,[95] courts continue to hold that "S-3 eligibility is still an important factor in determining market efficiency."[96]

### (e) Causation

The fifth *Cammer* factor, the "cause-and-effect relationship between company disclosures and an immediate response in the price of the stock,"[97] is "the essence of an efficient market and the foundation for the fraud on the market theory."[98] "'An efficient capital market is one in which the price of the [security] at a given time is the best estimate of what the price will be in the future.'"[99] Hence, in an efficient market, a security's price remains stable in the absence of news, and changes rapidly as the market receives new and unexpected

---

[95]     At the time *Cammer* was decided, "companies could qualify to use the S-3 Registration Form only if they had filed SEC reports continuously for thirty-six months and had at least $150 million in float." *Krogman*, 202 F.R.D. at 477.

[96]     *Id.* (citation omitted).

[97]     *In re Xcelera.com Sec. Litig.*, 430 F.3d at 512.

[98]     *Cammer*, 711 F. Supp. at 1287. *Accord In re Xcelera.com Sec. Litig.*, 430 F.3d at 512 ("In the absence of such a relationship, there is little assurance that information is being absorbed into the market and reflected in its price."); *Unger*, 401 F.3d at 324 (stating that the fifth *Cammer* factor "goes to the heart of the 'fraud on the market' theory.").

[99]     *Finkel v. Docutel/Ollivetti Corp.*, 817 F.2d 356, 360 n.8 (5th Cir. 1987) (quoting Fischel, 38 Bus. Law. at 4 n.9).

information.[100]  Because many variables have the potential to and, in fact, do affect the price of a security,[101] "expert testimony may be helpful because of the utility of statistical event analysis" to isolate the true effect of corporate financial disclosures.[102]

### c. Standard of Proof

In the six months since the Second Circuit decided *Heerwagen*, there has been only one case in which a court applied *Heerwagen*'s apparent dual standard of proof to the transaction causation element of the predominance requirement of Rule 23(b)(3).  In *In re Salomon Analyst Metromedia Litigation*, plaintiffs sought class certification for the class of all purchasers of Metromedia Fiber Network, Inc. in a four-month period.[103]  Plaintiffs alleged that defendant research analysts engaged in a scheme to defraud purchasers and sellers of Metromedia stock by issuing materially misleading analyst reports.[104]  The court

---

[100]    *See Krogman*, 202 F.R.D. at 477.

[101]    Such variables may include the daily market average; national, local and industry-specific economic news; competitors' activities; the overall volatility of the stock price; and the speed of its reaction to company news.

[102]    *Unger*, 401 F.3d at 325.

[103]    *See* 2006 WL 1716873, at *1 (Lynch, J.).

[104]    *See id.*

-29-

held that "the question of whether *Basic* applies is 'effectively identical' to several merits questions — most importantly, it is identical to the question of reliance."[105] Because of that conclusion, the court applied the "some showing" standard to the question of class certification.

In *In re Salomon Analyst Metromedia Litigation*, there was "no dispute that Metromedia stock was actively traded on an open, developed, and generally efficient securities market";[106] rather, the issue was whether defendants' public statements "actually had an effect on the value of Metromedia shares."[107] The "question of whether *Basic* applies" in *In re Salomon Analyst Metromedia Litigation* was therefore a question of causation — a merits issue — not of market

---

[105]    *Id.* at *12. One week before *In re Salomon Analyst Metromedia Litig.* was decided, another court in this district held that "[t]o prevail on their motion for class certification, plaintiffs must make 'some showing' that the proposed class comports with Rule 23," including the predominance requirement of Rule 23(b)(3). *Poddar v. State Bank of India*, 235 F.R.D. 592, 594 (S.D.N.Y. 2006) (Cedarbaum, J.) (quoting *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179 (S.D.N.Y. 2005)). The *Poddar* court, however, did not address the critical question of whether or not the presumption of reliance is a merits issue, nor did it frame its analysis in light of the Second Circuit's decision in *Heerwagen*.

[106]    *In re Salomon Analyst Metromedia Litig.*, 2006 WL 1716873, at *13. In fact, the average daily trading volume of Metromedia stock exceeded eleven million shares. *See id.* at *3.

[107]    *Id.* at *13. Judge Lynch noted that "an actual causal effect on market share price . . . is *not* an element of the *Basic* presumption of reliance," although such relationship is presumed absent rebuttal. *See id.*

-30-

efficiency — a condition precedent for applying the presumption.[108]

Not all courts have identified transaction causation as a merits issue. In *In re Genesis Intermedia Securities Litigation*, a Minnesota district court held that in analyzing whether plaintiff has satisfied the predominance requirement for the transaction causation issue, the court "is not passing on the merits of [plaintiff's] claims."[109] In *Fogarazzo v. Lehman Brothers*, I distinguished two related issues in a motion for class certification under Rule 23(b)(3): *first*, "whether plaintiffs' allegations [of reliance, etc.] are capable of being proved on a common basis for all class members,"[110] and *second*, "'whether the evidence will ultimately be persuasive.'"[111] Although the second issue requires an "examination of the merits,"[112] the first issue is independent of the merits and is therefore an appropriate issue on which to offer expert testimony at the class certification stage.[113]

---

108   *Id.* at *12.

109   232 F.R.D. 321, 333 n.15 (D. Minn. 2005).

110   No. 03 Civ. 5194, 2005 WL 361205, at *2 (S.D.N.Y. Feb. 17, 2005).

111   *Id.* at *2 n.16 (quoting *In re Visa Check*, 280 F.3d at 135).

112   *Id.* at *1.

113   *See id.* at *2, *2 n.18 (citing *In re IPO*, 227 F.R.D. at 111; *Emergent Capital*, 343 F.3d at 197). In *In re IPO*, I held that "whether the relevant markets

-31-

At the class certification stage, the securities' trading record may

create certain rebuttable legal presumptions about market efficiency. If, for

example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national

market, the market for that security is presumed to be efficient.[114] The defendant

were efficient is a question of fact to be resolved at trial." 227 F.R.D. at 107
(citing, inter alia, *Basic*, 485 U.S. at 249 n.29 ("Proof [rebutting a presumption of
reliance] is a matter for trial, throughout which the District Court retains the
authority to amend the certification order as may be appropriate."). *Accord
DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 121 (S.D.N.Y. 2004)
("It is not for the Court to decide, on a motion to dismiss . . . whether or to what
extent the market functioned efficiently. [This is an] issue[] of fact for trial.").
Because the efficiency (or lack thereof) of the market is an essential element of the
fraud-on-the-market presumption, my holding in *In re IPO* suggests that
transaction causation is a merits issue and is therefore subject to the "some
showing" standard. (The 2004 *IPO* opinion was written more than a year before
*Heerwagen*'s articulation of a dual standard of proof.) A higher standard of proof,
*e.g.*, preponderance of the evidence, at the class certification stage runs the risk of
"binding . . . the finder of fact" at trial. *In re IPO*, 227 F.R.D. at 107. In *In re IPO*
there was ample evidence that the relevant markets were efficient — "*first*, all the
focus stocks were traded on the NASDAQ National Market; *second*, the focus
stocks were traded actively at high volumes throughout the class period; and *third*,
the focus stocks were the subject of numerous analyst reports and extensive media
coverage." *Id.* (emphasis in original). None of these factors are present here.

[114] *See, e.g., In re IPO*, 227 F.R.D. at 107 n.324 ("Federal courts have
repeatedly held that a listing on NASDAQ or a similar national market is a good
indicator of efficiency"); *Levine*, 2002 WL 31056919, at *5 ("Although not
dispositive, the fact that SkyMall stock is traded on the NASDAQ stock market's
National Market System also contributes to finding that the market is efficient.");
*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 404-05
(S.D.N.Y. 2002) ("numerous courts have held that stocks trading on the AMEX
are almost always entitled to the presumption.") (citations omitted). *But see Bell
v. Ascendant Solutions, Inc.*, No. 3:01-CV-0166-N, 2004 WL 1490009, at *5

-32-

may rebut this presumption of efficiency, either at the class certification stage or at trial. If the defendant succeeds, the plaintiff may not benefit from the fraud-on-the-market presumption of transaction causation and will have to rely either on the *Affiliated Ute* presumption of transaction causation or proceed as an individual action. On the other hand, if a security is traded infrequently or not at all, the market for that security is presumed to be inefficient. The plaintiff must rebut this presumption of inefficiency in order to utilize the fraud on the market theory of reliance.

In sum, *whether the plaintiff may take advantage of the presumption of reliance* (through either *Affiliated Ute* or *Basic*) and *whether the plaintiff has proven reliance* are distinct inquiries. The former is required for class certification because it is the only way for plaintiff to show that reliance — a material element of the underlying Section 10(b) and Rule 10b-5 material misrepresentation claim — is subject to generalized proof. In other words, without a presumption of transaction causation, plaintiff will have to prove reliance on an individual basis, and the proposed class action will not satisfy the predominance requirement of

(N.D. Tex. July 1, 2004) ("[N]o court has ever held that efficiency is established solely by the listing of a stock on a national stock exchange. . . ."); *O'Neil*, 165 F.R.D. at 504 ("No court has ever held that a finding of efficiency can be based on the mere fact that a stock is traded on NASDAQ. . . .").

Rule 23(b)(3). The use of a presumption to prove transaction causation is simply a procedural tool that allows a plaintiff to satisfy the predominance requirement of Rule 23(b)(3). At the certification stage, a court must determine, without conducting an inquiry into the merits of the claim, whether a plaintiff may avail itself of the presumption. Accordingly, because the *availability* of the presumption is not a merits issue, the Court must determine whether plaintiff has demonstrated the efficiency of the market by the preponderance of the evidence.

## IV. DISCUSSION

### A. Teamsters Cannot Rely on the *Affiliated Ute* Presumption

Teamsters argues that it is entitled to the *Affiliated Ute* presumption because Bombardier allegedly failed to disclose the following:[115] *first*, that Bombardier materially disregarded its own underwriting standards;[116] *second*, that Bombardier's stated initiative to improve collateral performance would be ineffective;[117] and *third*, that Bombardier's fraudulent underwriting practices, not "market conditions," caused the poor collateral performance.[118] These alleged

---

[115]    *See* Pl. Mem. at 16.

[116]    *See* Compl. ¶¶ 69, 72-79.

[117]    *See id.* ¶ 100.

[118]    *See id.* ¶¶ 104, 108.

-34-

omissions, however, are simply the flip side of the following affirmative misstatements made by Bombardier: *first*, that Bombardier adhered to its underwriting standards;[119] *second*, that Bombardier's initiatives were effective;[120] and *third*, that market conditions were the cause of the Certificates' poor performance.[121] Moreover, this is certainly not a case "in which no positive statements exist [and] reliance as a practical matter is impossible to prove."[122] On the contrary, there is no shortage of alleged misstatements on which Teamsters may show that it relied when it purchased the Certificates.[123] Because positive statements, not omissions, are central to the alleged fraud, Teamsters cannot not rely on the *Affiliated Ute* presumption.

## B. Teamsters Cannot Rely on the Fraud on the Market Presumption

Both Teamsters and Bombardier rely on expert reports in support of their arguments concerning the efficiency of the Certificate market. Dr. Tavy Ronen, Teamsters' expert, is an Associate Professor of Finance at Rutgers

---

[119]   *See id.* ¶¶ 81-90, 100-101.

[120]   *See id.* ¶¶ 15, 100-101, 120(f).

[121]   *See id.* ¶¶ 16, 103-105, 108-109, 120(g).

[122]   *Wilson*, 648 F.2d at 93.

[123]   These alleged misstatements are contained in the numerous prospectuses issued by Bombardier and in other public statements.

University;[124] Dr. Andrew Carron, Bombardier's expert, is President of National Economic Research Associates (NERA) Economic Consulting, a subsidiary of Mercer Specialty Consulting.[125] As neither party has questioned the qualifications of the other's expert, I turn to the merits of the experts' arguments.

### 1.    The *Cammer* Factors

#### a.    Trading Volume

Teamsters argues that the trading volume based on the value of the Certificates traded and as a percentage of the outstanding Certificates indicates that the Certificate market was efficient.[126] Although the average daily trading volume for those days in which trades occurred is fifteen million dollars,[127] this figure is misleading — some classes of Certificates went months and even years without trading,[128] and no Certificates at all traded on 82.3% of the days in the

---

[124]    *See* 2/17/06 Affidavit of Dr. Tavy Ronen in Support of Class Certification ("Ronen Aff."), Ex. A to 2/17/06 Declaration of Joel P. Laitman, counsel for Teamsters, in Support of Class Certification ("Laitman Decl.") ¶ 1. *See also* Resume of Tavy Ronen, Ex. A to Ronen Aff.

[125]    *See* 3/17/06 Affidavit of Dr. Andrew S. Carron in Opposition to Class Certification ("Carron Aff.") ¶ 1. *See also* Curriculum Vitae of Andrew S. Carron, Ex. 1 to Carron Aff.

[126]    *See* Pl. Mem. at 18.

[127]    *See* Ronen Aff. ¶ 19.

[128]    *See* Carron Aff. ¶ 21.

Class Period.[129] When the infrequency of Certificate trades is included in the

statistics, the data show an average of only 0.026 trades a day per Certificate.[130]

     *Cammer* measures turnover as the average weekly trading volume as

a percentage of the outstanding shares.[131] Ronen calculates a turnover value of

1.7, which is the total amount traded in all securities identified in the Second

Amended Complaint, divided by the "cross sectional average (across tranches)[132]

outstanding principal balance,"[133] expressed as a weekly figure.[134] As Carron

notes, however, Ronen calculated turnover by dividing "the total volume for *all*

tranches by the average size of *one* tranche,"[135] which inflates the turnover value

---

[129]    *See id.*

[130]    *See id.*

[131]    *Cammer*, 711 F. Supp. at 1286. In other words, if there is one hundred million dollars of outstanding Microsoft stock, and over the course of a year fifty-two million dollars of Microsoft stock was traded, then the turnover (as defined in *Cammer*) would be one million dollars (average weekly trading volume) divided by one hundred million dollars (value of outstanding stock), or one percent.

[132]    Tranches are "separate classes of securities which are often created with different time weighted average maturity of pricnipal cash flows." Ronen Aff. ¶ 12.

[133]    *Id.* ¶ 20.

[134]    *See id.* ¶ 20 n.12.

[135]    Carron Aff. ¶ 25.

-37-

by a factor of twenty.[136] Thus, the turnover is 0.085, or 8.5%, which nonetheless

supports a finding that the Certificates traded in an efficient market.[137]

### b. Analysts

Ronen identifies forty-four financial analysts from twenty-eight firms

that specifically reported on BI during the Class Period.[138] Because BCI was

servicing the collateral for the Certificates, and because BI financially supported

BCI, Ronen argues that analysts who followed BI followed the Certificates as

well.[139] This argument is not persuasive. Teamsters has presented no evidence

that analysts specifically followed the Certificates, the value of which is tied to the

performance of the underlying mobile homes, and only incidentally to the

---

[136]    Carron reported the factor to be forty, *id.* ¶ 25, but Ronen's corrected figure represents a reduction of a factor of twenty. *See* Lead Plaintiff Teamsters Local 445 Freight Division Pension Fund's Reply Memorandum of Law in Further Support of Its Motion for Class Certification ("Reply Mem.") ¶ 11(b). Because the calculations here reflect data from only twenty tranches, it is appropriate to use a correction factor of twenty.

[137]    *See Cammer*, 711 F. Supp. at 1286 (holding that a turnover "of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one").

[138]    Ronen Aff. ¶ 21.

[139]    *See* 4/17/06 Reply Affidavit of Dr. Tavy Ronen in Further Support of Class Certification ("Reply Aff.") ¶ 22.

-38-

performance of BI or its subsidiaries.[140] The lack of analysts covering the

Certificates supports a finding that the Certificates traded in an inefficient market.

### c. Market Makers

Ronen argues that the lead underwriter acted as a market maker for

each of the Certificate classes,[141] but the experts disagree as to the proper

definition of a "market maker." The National Association of Securities Dealers

(NASD), the leading private-sector provider of financial regulatory services,

defines "market maker" as "[a] firm that maintains a firm bid and offer price in a

given security by standing ready to buy or sell at publicly-quoted prices."[142] The

SEC defines "market maker" as "a firm that stands ready to buy and sell a

particular stock on a regular and continuous basis at a publicly quoted price."[143]

Finally, the SEC's regulations define "market maker" as

> a dealer who, with respect to a particular security, (i) regularly
> publishes bona fide, competitive bid and offer quotations in a
> recognized interdealer quotation system; or (ii) furnishes bona

[140]    *See id.*

[141]    *See* Ronen Aff. ¶ 24 (citing Katrina Ellis et al., *When the Underwriter Is the Market Maker: An Examination of Trading in the IPO Aftermarket*, 60 J. Fin. 1039 (2000) (stating that the lead underwriter is always the dominant market maker for equity IPOs)).

[142]    Glossary of Terms, http://www.nasd.com/Resources/Glossary/.

[143]    Market Maker, http://www.sec.gov/answers/mktmaker.htm.

> fide competitive bid and offer quotations on request; and, (iii) is
> ready, willing and able to effect transactions in reasonable
> quantities at his quoted prices with other brokers or dealers.[144]

Because Certificates are not equities, it makes sense to adopt the general definition

of "market maker" given in the SEC's regulations. No firm "regularly

publish[ed]" bids and quotes for the Certificates.[145] Moreover, Teamsters has

failed to show that there were firms who would furnish bids and quotes on request

and who would effect transactions for each Certificate. Teamsters' argument that

the Certificates are like equity IPOs (in that the lead underwriter acts as a market

maker)[146] is unavailing. Rather, as with the question of analyst coverage discussed

above, Teamsters must independently address the efficiency of the Certificate

market. Because Teamsters has failed to show that there were market makers for

each of the Certificates, this factor supports a finding that the Certificates traded in

an inefficient market.

### d. SEC Registration Form S-3

It is undisputed that for each class of Certificates, Bombardier filed

---

[144]    17 C.F.R. § 240.15c3-1[c]8 (2006).

[145]    Carron Aff. ¶ 18(b).

[146]    *See* Ronen Aff. ¶ 24.

an SEC Registration Form S-3.[147] This factor therefore supports a finding that the Certificates traded in an efficient market.

### e. Causation

To measure causation, Ronen conducted an event study from which she concludes that several positive and negative announcements were associated with abnormal movements in Certificate prices and excess returns.[148] Carron claims that Ronen's event methodology is unsound for two reasons. *First*, Ronen uses Bloomberg prices, not transaction prices, in conducting her event study.[149] Bloomberg prices derive from a proprietary matrix that incorporates not only transaction prices, if there are any, but also current news regarding the company.[150] After analyzing both Bloomberg prices and transaction prices for the Certificates, Carron concludes that Bloomberg prices experienced greater variation over time than transaction prices,[151] that Bloomberg prices and transaction prices often

---

[147]   *See id.* ¶ 23.

[148]   *See id.* ¶ 27.

[149]   *See id.*

[150]   *See* Carron Aff. ¶ 30.

[151]   *See id.* ¶ 33.

-41-

moved in different directions,[152] and that transaction prices did not react to unexpected news as significantly as Bloomberg prices.[153]

Ronen responds to Carron's critique of Bloomberg prices by arguing that "Bloomberg and other pricing services perform the role of analysts when there are no publicly available prices . . . their 'indications' constitute a reasonable proxy for transaction prices."[154] I disagree. Because Bloomberg and other proprietary pricing services presuppose that security prices reflect information about the company (or, in this case, the Certificate collateral), these "prices" *assume* market efficiency. To use prices that assume market efficiency in an event study designed to determine whether or not that market is efficient is circular reasoning. Where Bloomberg prices materially differ from transaction prices, as they do here, event studies must use transaction prices.

*Second*, Ronen's event study analyzes price reactions to news solely concerning the financial health of BI, not its mortgage division.[155] In fact, BI's

---

[152]    *See id.* ¶ 35.

[153]    *See id.* ¶¶ 36-37.

[154]    Reply Aff. ¶ 15(a).

[155]    *See* Carron Aff. ¶ 28.

-42-

stock price and the Certificates' price often moved in opposite directions.[156] The

news analyzed in event studies must relate to the underlying financial health of the

Certificates — news relating to BI generally is not sufficiently material to the

financial health of the mobile home installment sales contracts and mortgage loans

that constitute the Certificates' collateral.

The reaction of Certificate transaction prices to unexpected news

about the Certificate collateral presents a different picture. There were no material

price drops in the Certificates after they were downgraded below investment grade

in December 2002 and February 2003.[157] Because the transaction prices of the

Certificates reacted weakly to unexpected downgrades, this factor strongly

supports a finding that the Certificates traded in an inefficient market.

### 2. Comparison to FIPS High-Yield Corporate Bonds

Much of Ronen's analysis centers on comparing the Certificate

market to the market for Fixed Income Pricing System ("FIPS") high-yield

corporate bonds.[158] But Teamsters has not cited a single case in which a market

---

[156]    *See id.* ¶ 29.

[157]    *See id.* ¶ 37.

[158]    *See* Ronen Aff. at 3-5; *see also* Edith S. Hotchkiss and Tavy Ronen,
*The Informational Efficiency of the Corporate Bond Market: An Intraday
Analysis*, 15 Rev. Fin. Stud. 1325 (2002), Ex. B to Ronen Aff.

for one type of security was found efficient merely by analogy to another type of security. In order for the Certificate market to be found efficient, that market must *independently* satisfy at least some of the factors. Indeed, to the extent that the proposed analogy is relevant, then the market on which these Certificates trade should satisfy many, if not all, of the factors.

### 3. The Totality of the Circumstances

Using the foregoing factors as an analytical tool rather than as a checklist, I conclude that Teamsters has failed to show by a preponderance of the evidence that the market for the Certificates was efficient. Although the Certificates had a high average weekly trading volume and Bombardier filed an SEC Registration Form S-3, the infrequent trades, the absence of analysts following the Certificates, the absence of market makers for the Certificates, and especially the lack of a causal relationship between unexpected news and an immediate response in the price of the Certificates, all tend to establish the inefficiency of the Certificate market. Accordingly, Teamsters cannot rely on the fraud on the market presumption.[159]

---

[159]    I note that Teamsters' expert report submitted on the certification motion, although failing to establish an efficient market by a preponderance of the evidence, is "not so flawed that it would be inadmissible as a matter of law." *In re Visa Check*, 280 F.3d at 135. For this reason, if I were applying the "some showing" standard of proof in this case, I would find that Teamsters *has* made a

## C. Without a Presumption of Reliance, Teamsters Cannot Satisfy the Predominance Requirement

Because Teamsters cannot rely on either the *Affiliated Ute* or the

fraud on the market presumptions of transaction causation, Teamsters cannot

prove reliance on a class-wide basis, and each plaintiff will have to prove reliance

individually. Although the predominance requirement of Rule 23(b)(3) does not

mandate that *all* issues be capable of generalized proof,[160] when plaintiffs must

individually prove reliance — an element of their Rule 10b-5 material

misrepresentation claim — the putative class action fails the predominance

---

sufficient showing of market efficiency to merit class certification (assuming the
other elements of Rule 23 were also established). *See In re IPO*, 227 F.R.D. at
114-15 (quoting *In re Visa Check*, 280 F.3d at 135) (plaintiffs' expert report
sufficient to demonstrate that *loss causation* (in my view a merits issue) could be
shown on a class-wide basis, and rejecting defendants' attacks on the expert's
methodology – "now is not the time to 'weigh conflicting evidence or engage in
statistical dueling of experts.' Defendants are free to attack [the expert's] theory at
trial or present alternative theories if they choose."). If the Second Circuit
ultimately decides that the "some showing" standard applies to *all* issues raised in
a motion for class certification, reconsideration of this Opinion would be
appropriate.

[160]     Indeed, some issues, *e.g.* damages, are not susceptible to common
proof, yet the class action still satisfies the predominance requirement. *See, e.g.*,
*In re Visa Check*, 280 F.3d at 139 ("Common issues may predominate when
liability can be determined on a class-wide basis, even when there are some
individualized damage issues.").

requirement.[161] Thus, Teamsters cannot satisfy the predominance requirement of

Rule 23(b)(3).[162]

---

[161]    *See Basic*, 485 U.S. at 242 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones."). Although the Second Circuit in *Green v. Wolf Corp.* held that individual differences in proof of reliance can be accounted for through separate trials, *see* 406 F.2d 291, 301 (2d Cir. 1968), *Green* predated the Supreme Court's articulation of the *Affiliated Ute* and *Basic* presumptions. Since *Basic* was decided in 1988, the Second Circuit has never cited *Green* for the above proposition. Moreover, only four district court opinions in the Second Circuit have cited *Green* for the above proposition since 1988, and they did so either in dicta or circumstances quite different from the case at bar. *See Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 58 (S.D.N.Y. 1993) (discussing *Green* in the choice of law context); *Zupnick v. Thompson Parking Partners*, No. 89 Civ. 6607, 1990 WL 113197, at *5 (S.D.N.Y. Aug. 1, 1990) (discussing the commonality requirement, not the predominance requriement); *Kallus v. General Host Corp.*, Civ. No. B-87-160, 1988 WL 124074, at *4 (D. Conn. July 1, 1988) (holding that different dates of stock sales did not cause individual issues to predominate over common issues); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335 (S.D.N.Y. 1988) (applying *Green* where different representations were made to various investors). *Green*'s mechanism of holding separate trials on the issue of reliance is appropriate only where the securities at issue were traded in an efficient market. *See In re Livent Noteholders Sec. Litig.*, 211 F.R.D. 219, 223-24 (S.D.N.Y. 2002) (holding that in an efficient market, a common presumption of reliance among the class members renders those individual members to whom the presumption does not apply, such as investors who did not rely on the price of the security, exceptions to the general rule).

[162]    Because Teamsters cannot prove reliance on a class-wide basis, I do not reach Bombardier's claim that individual issues of falsity, materiality, and loss causation also predominate over common issues. *See* Def. Mem. at 16-18. Similarly, because Teamsters cannot show predominance, I do not reach Bombardier's claim that the putative class action fails to satisfy the typicality, adequacy, and superiority requirements. *See id.* at 14-15, 18-25.

-46-

## V. CONCLUSION

For the foregoing reasons, Teamsters' motion for class certification is denied. The Clerk of the Court is directed to close this motion [number 47 on the docket sheet]. A conference is scheduled for August 11, 2006, at 3:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 1, 2006

## - Appearances -

*For Plaintiff:*

Joel P. Laitman, Esq.
Christopher Lometti, Esq.
Jay P. Saltzman, Esq.
Frank R. Schirripa, Esq.
SCHOENGOLD SPORN LAITMAN & LOMETTI, P.C.
19 Fulton Street, Suite 406
New York, NY 10038
(212) 964-0046

*For Defendants:*

A. Robert Pietrzak, Esq.
Patrick M. McGuirk, Esq.
Isaac S. Greaney, Esq.
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300